# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| LABORERS' LOCAL 265 PENSION FUND and PLUMBERS AND PIPEFITTERS LOCAL NO. 572 PENSION FUND, <br><br> Plaintiffs, <br><br> v. <br><br> iSHARES TRUST; iSHARES, INC.; iSHARES RUSSELL MIDCAP INDEX FUND; iSHARES MSCI EAFE INDEX FUND; iSHARES MSCI EMERGING MARKETS INDEX FUND; iSHARES RUSSELL 2000 GROWTH INDEX FUND; iSHARES RUSSELL 2000 VALUE INDEX FUND; iSHARES CORE S&P MID CAP INDEX FUND; iSHARES CORE S&P SMALL-CAP INDEX FUND; iSHARES DOW JONES US REAL ESTATE INDEX FUND; BLACKROCK FUND ADVISORS; BLACKROCK INSTITUTIONAL TRUST COMPANY, N.A.; ROBERT S. KAPITO; MICHAEL LATHAM; ROBERT H. SILVER; GEORGE G.C. PARKER; JOHN E. MARTINEZ; CECILIA H. HERBERT; CHARLES A. HURTY; JOHN E. KERRIGAN; and MADHAV V. RAJAN, <br><br> Defendants. | No. _____ |

---

## VERIFIED COMPLAINT

---

Plaintiffs, Laborers' Local 265 Pension Fund and Plumbers and Pipefitters Local No. 572 Pension Fund (The "Pension Plans"), operate pension plans for the benefit of members of Laborers' Local 265 and Plumbers and Pipefitters Local No. 572, respectively, are investors in individual iShares funds, and bring this action against Defendants and allege as follows:

# INTRODUCTION

1.    This is a case about overt conflicts of interest and the negative effects they have on investor returns. The Pension Plans seek to recover funds rightfully owed to them as iShares shareholders, which were improperly spent by iShares's management on grossly excessive compensation to securities lending agents affiliated with iShares and certain of their affiliates.

2.    Recent academic research confirms that when mutual fund companies like iShares use affiliated agents to manage security lending transactions, the agents work against the interests of mutual fund investors by siphoning off securities lending profits for the benefit of mutual fund managers.

3.    Here, Defendants engaged in just such a scheme, arranging for affiliates of iShares to take at least forty percent (40%) of securities lending revenues for themselves at the expense of investors – a fee entirely disproportionate to the performance of those affiliates which amounted to "money for nothing", as described by one Wall Street Journal commentator. [1]

4.    In enacting the Investment Company Act of 1940 (the "Act") and subsequent amendments, Congress recognized that market forces alone could not protect investors from such self-dealing and therefore specifically imposed a fiduciary duty on mutual funds which requires not merely that mutual funds disclose fees paid to affiliates but that they ensure such payments are fair and reflective of what would be paid in arms-length transactions. Defendants have systematically violated their fiduciary duties, setting up an excessive fee structure designed to loot securities lending returns properly due to iShares investors.

---

[1] Jason Zweig, "Is your fund pawning shares at your expense?," The Wall Street Journal (May 30, 2009).

5.     Defendants' actions breached the fiduciary duties owed to investors pursuant to federal law.  The Pension Plans bring this case derivatively and on behalf of all similarly situated iShares investors.

## PARTIES

6.     Plaintiff Laborers' Local 265 Pension Fund, a pension fund established for the benefit of Local 265 members, maintains its principal place of business at 205 West Fourth Street, Suite 225, Cincinnati, Ohio 45202.  Laborers' Local 265 Pension Fund held shares in one or more of the named iShares funds at issue in this litigation (collectively, all of the funds at issue, owned by either Plaintiff, are the "Funds") at all times relevant to this action and continues to hold shares in those funds.  The earnings on Laborers' Local 265 Pension Fund's investment in the funds go toward financing the pension benefits on which Plaintiff's participants depend for their retirement.

7.     Plaintiff Plumbers and Pipefitters Local No. 572 Pension Fund, a pension fund established for the benefit of Local No. 572 members, maintains its principal place of business at 225 Ben Allen Road, Nashville, TN 37207.  Plumbers and Pipefitters Local No. 572 Pension Fund held shares in one or more of the named iShares funds at issue in this litigation at all times relevant to this action and continues to hold shares in those funds.  The earnings on Plumbers and Pipefitters Local No. 572 Pension Fund's investment in the Funds go toward financing the pension benefits on which Plaintiff's participants depend for their retirement.

8.     The Pension Plans chose to put money into the Funds in exchange for a financial return on that investment in order to grow the monies available for pension benefits.  The Pension Plans consider risks when making investments, and expect that mutual fund managers will manage funds with the goal of optimizing returns for the benefit of investors.

3

9.    All Defendant entities are subsidiaries or affiliated entities of BlackRock, Inc. ("Blackrock") BlackRock is headquartered at 55 East 52nd Street, New York, New York 10055.  The Pension Plans provide the following illustration of BlackRock, Inc.'s control over the Defendants entities for ease of reference:



10.    Nominal defendant iShares, Inc. is a Maryland Corporation.  iShares, Inc. is an open-ended management investment company registered under the the Act.

11.    Nominal defendant iShares Trust is a Delaware Statutory Trust.  iShares Trust is an open-ended management investment company registered under the Act.

12.    iShares Trust and iShares, Inc. ("iShares") issue shares of investment funds – iShares Exchange Traded Funds ("ETF's") – each of which is a separate investment portfolio. iShares Trust and iShares, Inc. are the largest ETF providers in the world, comprised of at least

440 separate funds. As of May 2011, iShares held more than $480 billion in assets under management. The ETF's in which iShares issues shares are part of an "Exchange-Traded Fund Complex" and are managed by iShares.

13. Nominal defendants iShares Russell Midcap Index Fund (IWF), iShares MSCI EAFE Index Fund (EFA), iShares MSCI Emerging Markets Index Fund (EEM), iShares Russell 2000 Growth Index Fund (IWO), iShares Russell 2000 Value Index Fund (IWN), iShares Core S&P Mid Cap Index Fund (IJH), iShares Core S&P Small-Cap Index Fund (IJR), and iShares Dow Jones U.S. Real Estate Index Fund (IYR) ("Funds") are individual ETFs within the family of funds issued by iShares. The Laborers' Local 265 Pension Fund currently holds, and at all times relevant to this action held, shares in iShares Russell Midcap Index Fund. The Plumbers and Pipefitters Local No. 572 Pension Fund holds, and at all times relevant to this action held, shares in iShares MSCI EAFE Index Fund, iShares MSCI Emerging Markets Index Fund, iShares Russell 2000 Growth Index Fund, iShares Russell 2000 Value Index Fund, iShares Core S&P Mid Cap Index Fund, iShares Core S&P Small-Cap Index Fund, and iShares Dow Jones U.S. Real Estate Index Fund.

14. Defendant BlackRock Institutional Trust Company, N.A., a national banking association ("BTC") is a wholly-owned subsidiary of BlackRock, Inc., as well as the corporate parent of BFA, providing securities lending services to iShares and other investment funds. Specifically, BTC acts as a middleman between short-sellers and other borrowers who want to borrow securities held by iShares in order to effectuate a short-selling investment strategy. In exchange for its services, BTC receives a fee calculated as a percentage, or "split," of securities lending revenue. BTC is headquartered at 400 Howard Street, San Francisco, California, 94105.

15. Defendant BlackRock Fund Advisors ("BFA"), is a registered investment advisor. BFA is a wholly-owned subsidiary of BTC. BFA is headquartered at 400 Howard Street, San Francisco, California 94105.

16. BFA, during all periods relevant to this litigation, has managed and advised iShares and the Funds with respect to their investment activities.

17. BFA carries out these management activities pursuant to Investment Advisory Agreements with iShares, Inc. and iShares Trust, through which it receives an annual management fee calculated as a percentage of the average daily net assets of each fund, including the Funds, issued by iShares.

18. BFA and BTC are affiliates for purposes of the Act.

19. BFA is an affiliate of BlackRock, iShares, Inc., iShares Trust and each Fund for purposes of the Act.

20. BTC is an affiliate of BlackRock, iShares, Inc., iShares Trust and each Fund for purposes of the Act.

21. Defendants Robert S. Kapito, Michael Latham, Robert H. Silver, George G.C. Parker, John E. Martinez, Cecilia H. Herbert, Charles A. Hurty, John E. Kerrigan and Madhav V. Rajan ("Defendant Directors")[2] are current members of the iShares Trust Board of Trustees and the Board of Directors of iShares, Inc.

22. Defendant Kapito was appointed to the iShares Trust Board of Trustees and the iShares, Inc. Board of Directors in 2009. He is also the President and Director of BlackRock, Inc., Vice Chairman of BlackRock, Inc., and Head of BlackRock's Portfolio Management

---

[2] These individuals are both "trustees" of the iShares Trust and "directors" of iShares, Inc. As a convenience, however, Plaintiff will refer to them only as "Directors."

Group.  Defendant Kapito is an "interested person" of iShares, Inc. and iShares Trust under the Act.

23.    Defendant Latham was appointed to the iShares Trust Board of Trustees and the iShares, Inc. Board of Directors in 2010.  He is also the Global Chief Executive Officer of iShares, Managing Director of BTC, and Head of Americas iShares.  He is also a past director and officer of Barclays Global Investors International, Inc. Defendant Latham is an "interested person" of iShares, Inc., and iShares Trust under the Act.

24.    Defendant Silver has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2007.  Silver receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Silver received total compensation from iShares and related entities in 2011 of $250,000; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

25.    Defendant Parker has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2000.  Parker receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Parker received total compensation from iShares and related entities in 2011 of $300,000; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

26.    Defendant Martinez has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares Inc. Board of Directors since 2003.  He is also a Director of EquityRock, Inc.   Martinez receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Martinez received total compensation from iShares and related

7

entities in 2011 of $261,765; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

27.     Defendant Herbert has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2005.  Herbert receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Herbert received total compensation from iShares and related entities in 2011 of $261,765; for 2012, her annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and she has already received thousands of dollars from individual iShares funds.

28.     Defendant Hurty has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2005.  Hurty receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Hurty received total compensation from iShares and related entities in 2011 of $290,000; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

29.     Defendant Kerrigan has been a Trustee of the iShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2005. Kerrigan receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Kerrigan received total compensation from iShares and related entities in 2011 of $276,765; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

30.    Defendant Rajan has been a Trustee of the IShares Trust Board of Trustees and a member of the iShares, Inc. Board of Directors since 2011.[3]  Rajan receives compensation from multiple iShares funds, including the Funds, and iShares affiliates.  Rajan received total compensation from iShares and related entities in 2011 of $187,500; for 2012, his annual retainer has been increased to $275,000 (on top of which Directors receive various other forms of compensation) and he has already received thousands of dollars from individual iShares funds.

31.    Defendants Latham and Kapito are designated by iShares Trust as "interested trustees" and by iShares, Inc. as "interested directors."  Defendants Silver, Parker, Martinez, Herbert, Hurty, Kerrigan, and Rajan are designated by iShares Trust as "independent trustees" and by iShares, Inc. as "independent directors."

## JURISDICTION AND VENUE

32.    This court has jurisdiction over the claims asserted pursuant to Sections 36(a), (b), 44 and 47(b) of the Investment Company Act, 15 U.S.C. §§ 80a-35(a),(b), 15 U.S.C. § 80a-43, and 15 U.S.C. §80a-46(b) as well as 28 U.S.C. §§ 1331, 1332, 1337, and 1367.

33.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43, as The Plumbers and Pipefitters Local No. 572 Pension Fund maintains its principal place of business, including the offices of its investment manager, in this district, and iShares transacts business in this district by, *inter alia*, sending proxies and other materials from its funds into this district, soliciting sales of the funds in this district, and maintaining an interactive website which permits Tennessee residents to exchange information and transact business with iShares.  A substantial part of the events giving rise to the claims occurred in this district.

---

[3] For the remainder of this Complaint, Plaintiff will refer to the "Board of Trustees" of the iShares Trust and the "Board of Directors" of iShares, Inc. as the "Board" or "Boards."

## FACTUAL ALLEGATIONS

### Regulation of Mutual Funds Under the Investment Company Act of 1940

34. "The [Act] … regulates investment companies, including mutual funds. A mutual fund is a pool of assets, consisting primarily of a portfolio of securities, and belonging to the individual investors holding shares in the fund."[4]

35. Typically, a fund has an investment adviser which "selects the fund's directors, manages the fund's investments, and provides other services."[5]

36. The Funds at issue are mutual funds governed by the Act, and their investment adviser – BFA – fulfills this typical role, selecting the Funds' directors, managing the Funds' investments, and providing other services.

37. "Because of the relationship between a mutual fund and its investment adviser, the fund often cannot, as a practical matter, sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner that they do in other sectors of the American economy."[6]

38. "Recognizing that the relationship between a fund and its investment adviser was 'fraught with potential conflicts of interest', the Act created protections for mutual fund shareholders."[7]

39. A "cornerstone' of the Act's efforts to check conflicts of interest [is] … the independence of mutual fund boards of directors, which [are obligated to] negotiate and scrutinize adviser compensation…. [N]o more than 60 percent of a fund's directors [can, under the Act,]

---

[4] *Jones v. Harris Associates, L.P.*, 130 S. Ct. 1418, 1422 (2010)(internal citations omitted).
[5] *Id.*
[6] *Id.*
[7] *Id.*

be 'persons who are interested persons,' *e.g.*, that they have no interest in or affiliation with the investment adviser."[8]

40. Following the initial passage of the Act in 1940, the United States Securities Exchange Commission ("SEC"), the agency tasked with administering the Act, commissioned a study which "found that investment advisers often charged mutual funds higher fees than those charged the advisers' other clients and further determined that the structure of the industry, even as regulated by the Act, had proved resistant to efforts to moderate adviser compensation."[9]

41. "The SEC … determined that approval of adviser contracts by shareholders and independent directors could not alone provide complete protection of the interests of security holders with respect to adviser compensation."[10]

42. Responding to the SEC's concerns, Congress amended the Act to add Section 36(b) and thereby provide a cause of action by the SEC and/or mutual fund investors to recover excessive adviser fees authorized in breach of mutual funds' fiduciary duty to investors.

43. "This policy choice strongly indicates that Congress intended security holder and SEC actions under §36(b), on the one hand, and directorial approval of adviser contracts, on the other, to act as independent checks on excessive fees."[11]

<u>Securities Lending</u>

44. While return on a mutual fund's assets primarily comes from the good performance of securities held by the mutual fund, a mutual fund can also increase its value in other ways. One such manner is by "lending" out the mutual fund's securities to short-sellers – in-

---

[8] *Id.* at 1423 (citing 15 U.S.C. § 80a-10(a).
[9] *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 537 (1984).
[10] *Id.* at 538.
[11] *Id.* at 541.

vestors who seek to profit from the anticipated decline in value of particular stocks or other securities.  In exchange for a short-term "loan" of securities, borrowers typically provide the fund with cash or other collateral, which the fund invests.  Often the "borrower" of securities pays a fee to the lender for the privilege of borrowing particular securities.  The more difficult it is for short sellers to "borrow" a particular security, the higher the fee that a mutual fund holding that security can demand.  The return on the collateral held, plus any fees paid, constitute income, which, absent mismanagement, increases the value of the mutual fund and is, therefore, a benefit to investors in the form of a return on their investments.

45.     The term "securities lending" is misleading.  A "securities lending" transaction is actually a sale[12] of securities to a third party, through a "borrower" of the securities, at the direction of the "borrower."[13]  The borrower - a short seller - initiates the transaction in order to profit from a decline in the price of the securities.  The borrower borrows the securities – say, for example, ten shares of Company X - and simultaneously sells them to a willing third party buyer at market price – say, $100 per share.  As part of its agreement with the securities lender, the borrower agrees to return the borrowed shares on a specified date in the future.  On that date, the borrower re-purchases the shares on the open market. If, as the borrower anticipated, the price has dropped, then the borrower will be able to repurchase the Company X shares at a lower price than it sold them – say, $50 per share - and return them to the lender.  The borrower thus pockets the difference between the amounts it sold the borrowed shares for at the time it borrowed them and the lower price at which it repurchased the shares for return to the lender. In the example given, the borrower would obtain a gross profit (before transaction fees) on its

---

[12] Norwest Bank Minnesota NA; Society National Bank (pub. avail. May 25, 1995).
http://www.sec.gov/divisions/investment/noaction/1995/norwest052595.pdf
[13] For purposes of this Complaint, language associated with borrowing (e.g., "lend," "lent," "borrow," "collateral," etc.), will be used, even though an actual sale of securities takes place at the start of the transaction.

"short sale" of $500 – the $1000 it received when it sold the ten Company X shares it borrowed less the $500 it paid to re-purchase the same shares for return to the lender.

46. In a typical securities lending transaction, the borrower must provide the lender of the security cash or similar liquid assets in an amount slightly higher than the value of the borrowed shares as collateral in order to receive title to the shares so that they can be sold. The lender agrees to return the cash collateral to the borrower on the date the borrower returns the borrowed shares. Thus, for example, when an iShares Fund's securities are on loan, the fund holds collateral equal to the value of the securities, and can invest that collateral.

47. During the time that the securities are on loan, absolute title passes to the borrower, as do the economic benefits (such as dividends), and voting rights, until the security is sold to the third party.

48. In many securities lending transactions, a borrower of a security must pay a premium to secure the security for a short sale; in such transactions, the borrower receives no fee or rebate for the use of posted collateral but instead must pay a fee to the lender.

49. Whether a borrower of a security pays a premium, or receives a rebate, as well as the amount of the premium or rebate, is subject to an individual negotiation. No exchange or transparent electronic system exists to determine the "price" (either as a premium or a rebate, and the associated size of such premium or rebate) to a borrower who wants to short a given security.

50. Securities lending by any mutual fund involves an inherent conflict of interest because it facilitates short sellers who are trying to drive down the price of the very shares that funds are lending. In the words of one commentator, "[s]tock lending is controversial because

… the presence of short trades can put downward pressure on a share price, which would disadvantage the original ETF investor."[14]

51.  In contrast to mutual funds like iShares that actively lend securities, "some investors on the long side of the stock withdraw their securities from the lending pool precisely to make life miserable for the enemies, the short sellers."[15]

52.  Because no transparent market exists to determine the "price" that a borrower pays to short a stock, the transactions associated with the short-selling of a security (premium or rebate, amount of premium or rebate, indemnification, etc.) are rife with potential for abuse of conflicts of interest.

## Securities Lending Agents

53.  Mutual funds often use securities lending agents to manage securities lending transactions.

54.  Securities lending agents may be affiliated with the fund sponsor or may be third-party agents.  Affiliated agents are subject to stricter legal scrutiny, including but not limited to scrutiny by the Securities and Exchange Commission ("SEC"), because the close relationship with the sponsor creates inherent conflicts of interest.

55.  Affiliated lending agents profit at the expense of investor returns.  A recent academic study (the "Adams Study") has found extensive empirical evidence of wealth expropriation from fund shareholders when funds employ sponsor-affiliated lending agents.[16]  The Ad-

---

[14] http://citywire.co.uk/money/BlackRock-protects-ishares-etfs-from-stock-lending/a597719.
[15] Emily Lambert, "Securities Lending Meltdown," Forbes (June 22, 2009).
[16] Adams, John C. et al., "Affiliated Agents, Boards of Directors, and Mutual Fund Security Lending Returns" (2011), available at http://papers.ssrn.com/5013/papers.cfm.abstract_id=1947503.

ams Report "focus[ed] on index funds" – the very sort of funds at issue in this litigation.[17]  The Adams study concludes that "sponsor affiliated lending agents are associated with lower returns on lent securities" and that "security lending returns are lower when borrower's collateral is invested with sponsor affiliated agents," despite "increased levels of lending."[18]

56.    These conflicts of interest on the part of securities lending affiliates have been shown empirically to have a negative effect on returns to investors.  Affiliated lending agents are, on average, associated with a *70% reduction in lending returns* as compared to non-affiliated lending agents.[19]

57.    As analyzed by Professor Adams, this reduction in lending returns "provides compelling evidence that conflicts of interest exist in securities lending programs" and "suggests self-dealing behavior by some affiliated lending agents."[20]

58.     The Adams study found "strong evidence that the choice of security lending agent (e.g., affiliated vs. non-affiliated) is an important driver of variation across security lending programs and suggest conflicts of interest result in lower securities lending returns for mutual fund shareholders."[21]

59.    The Adams study confirms earlier findings by the SEC.  The Assistant Director of the SEC's Office of Compliance Inspection and Examinations has stated that a 2004 SEC study of mutual fund securities-lending practices found that "when an affiliated agent was involved, 'directors in pretty much all of the funds [the SEC] looked at were not adequately overseeing

---

[17] *Id.* at 5.
[18] *Id*. at 24.
[19] *Id.* at 17-18 (emphasis added).
[20] *Id.* at 17-18.
[21] *Id.* at 20.

the securities lending of the funds.'"  "In just about every circumstance where the funds lent securities through an affiliated agent, the SEC found problems."[22]

60.    Securities lending within the iShares funds – including the Funds at issue - is exemplary of this type of wealth expropriation.  BTC is the affiliated lending agent retained by BFA, BTC's wholly owned subsidiary, to manage securities lending transactions for the Funds.  BTC's contract with iShares has proven to be highly profitable for BTC, but not for The Pension Plans and other investors, the very persons for whose benefit iShares operates.

61.    For those iShares funds reporting net income from securities lending activities in 2011, the rate of return on those loans to investors, after paying the lending agent, has typically been between 0.25% and 0.30%.   This rate of return is comparable to the return on a 2-year U.S. Treasury bond or a 6-month standard certificate of deposit during the same time period.  The rate of return for self-administered lending programs is 0.93%, and funds using unaffiliated lending agents earn, on average, 0.49%.[23]

62.    The risk involved in securities lending is significantly greater than the risk of investing in Treasury bonds or CDs.  There are inherent risks in securities lending, including, among others, the risk that the borrower will not return the lent securities, the risk that the borrower will return them late, or the risk that the collateral will be inadequate to compensate the fund for any realized risk.

---

[22] Tom Lauricella, "SEC discovers breaches in lending securities, Wall Street Journal online ed. (December 4, 2012).
[23] Adams Study, *supra*; the relationship between BTC and BNA is set out in the Form N-1A filed by iShares Trust on November 18, 2011.

63.     The risks of securities lending have been underscored in news accounts describing "securities lending losses conservatively estimated in the billions of dollars [which] have incited legal battles between big Wall Street clients."[24]

64.     In an arm's length transaction, iShares, the Funds and the Defendant Directors would demand, and BTC and BFA would provide, returns that adequately compensate iShares for the risks inherent in securities lending transactions.  Instead, as described below, iShares, the Funds and the Defendant Directors have diverted securities lending revenues to affiliates such as BTC and BFA through payment of grossly excessive fees far beyond what would be negotiated in arm's length transactions with unaffiliated entities.  The Defendant Directors have breached their fiduciary duty to iShares investors when approving such excessive fees, and BFA and BTC have breached their respective fiduciary duties when taking those same fees.

65.     These breaches of fiduciary duty reflect the many conflicts of interest present in the iShares securities lending scheme, which go far beyond the elemental conflict created by selling to short sellers.  In many lending transactions involving securities owned by iShares ETFs such as the Funds, there is no disinterested or independent party to the deal.  The Funds are managed by BFA, wholly-owned subsidiary of BTC.  BTC, selected by its subsidiary BFA to be securities lending agent for the Funds, manages the securities lending transactions.  The securities are lent in many cases to borrowers who themselves, like BFA and BTC and iShares, are BlackRock affiliates.  BFA then often reinvests the cash or other collateral given for lent securities in short term instruments on behalf of the Funds, and at times that collateral is reinvested in joint accounts or money market funds associated with BFA or other BlackRock affiliates.

---

[24] Emily Lambert, "Securities Lending Meltdown," Forbes (June 22, 2009).

<u>Breaches of Fiduciary Duty With Regard to Compensation for Securities Lending</u>

*Breach 1 - disproportionately large management fees*

66.    BFA, acting as investment adviser to iShares and the Funds, has retained BTC, its parent company, to manage the lending of securities owned by iShares ETF's, including the Funds.

67.    BlackRock investor materials state that "[l]ending revenue generated by BlackRock on behalf of iShares ETFs is split 60/40 between the ETF and BlackRock."[25]

68.    BlackRock spokespersons have confirmed the 60/40 split in public statements, telling Reuters that "40 percent of revenue earned from securities lending goes to BlackRock, whilst 60 percent is returned to investors."[26]

69.    At least forty percent (40%) of revenue earned from securities lending transactions involving securities owned by the Funds has, during all periods to which the claims in this Complaint apply, been taken as compensation by BTC, BFA and other BlackRock affiliates.

70.    BTC's securities lending fees with respect to the Funds are set out in an Amended and Restated Securities Lending Agreement with iShares, Inc. and iShares Trust, among other entities.  That agreement provides that BTC shall be provided a fee of 35% of the "net amount earned on securities lending activities."  This 35% fee is, standing alone, disproportionally large and far higher than would be negotiated with all unaffiliated agent in an arms length transaction.

---

[25] http://uk.ishares.com/en/rc/about/securities-lending.
[26] Anjuli Davies, "European watchdog gets tough on securities lending," Reuters (July 25, 2012).

71. The iShares funds that are part of the "Exchange-Traded Fund Complex," including the Funds, are listed on a schedule to the Securities Lending Agreement and thus governed by a single agreement negotiated by iShares, Inc. and iShares Trust.

72. The remaining 5% of the "40% share" of securities lending revenues claimed by BlackRock in its public statements reflects, on information and belief, fees derived from securities lending in addition to the 35% off the top cut guaranteed BTC under its securities lending agreement, such as the inflated fees charged by BFA for investing collateral, described, *infra*.

73. These securities lending fees charged to iShares investors are disproportionately large - "about three times more than what is typical in the industry."[27]

74. A 2012 industry study published by Finadium. LLC, entitled US Plan Sponsors on Securities Lending, Collateral Management and Custody in 2012: A Finadium Survey (the "2012 Finadium Survey"), addresses fee splits in the securities lending industry and confirms that a majority of large plans have adopted a fee split of 90/10, providing their lending agents just ten percent of securities lending revenues, in contrast to the forty percent cut demanded by iShares.[28]

75. Finadium, LLC is an asset servicing and securities lending consultant that provides expertise information to plan sponsors, asset managers, and other firms in the financial industry.

76. The 2012 Finadium Survey is available to the public for a fee and is the fifth such annual study produced by Finadium.[29]

---

[27] Tim McLaughlin, "Cashing In," Portfolio.com (June 28, 2010).
[28] Josh Galper, "US Plan Sponsors on Securities Lending, Collateral Management and Custody in 2012: A Finadium Survey," p. 20 (Finadium, LLC, January, 2012).
[29] Galper, *supra*.

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 19 of 47 PageID #: 19

77.   The 2012 Finadium Survey was relies on information from leading asset management executives and provides "quantitative...data on securities lending and asset management."[30]

78.   The 2012 Finadium Survey, in addition to establishing that a majority of plans provided lending agents a ten percent securities lending fee, found that only a small fraction of plans – approximately 12% - provided their lending agent a fee in excess of 20%, a fee which, while itself far in excess of the industry standard, is still half that charged by iShares to investors in its funds.[31]

79.   iShares's excessive fee structure is entirely consistent with the findings of the Adams Study, which determined that use of "sponsor affiliated lending agents" like BTC resulted in securities lending returns "70% lower" than would be obtained through non-affiliated lenders.  The Adams study attributed this performance to "wealth expropriation from shareholders when funds employ sponsor affiliated lending agents."[32]

80.   In contrast to iShares, other major mutual funds not only meet the 90/10 industry standard fee structure confirmed in the 2012 Finadium Survey, but exceed it by withholding no percentage of securities lending revenues from their investors and reinvesting fully 100% of the revenue earned on securities lending in the mutual fund.

81.   As recently reported by Global Investor, "Vanguard already gives back 100% of its securities lending income whereas BlackRock keeps 40% of the revenue and returns 60%."[33]

---

[30] http://www.finadium.com/site/assetmanagers2012.php
[31] Galper, *supra*.
[32] Adams Study, 4-5.
[33] Stephanie Baxter, "Esma penalizes physical ETFs," Global Investor (July 2012).

82.    Thus, the Funds at issue are being charged 40% of revenues for services that holders of other major ETF's get for free.

83.    Wall Street Journal columnist Jason Zweig summed up the significance of the disparity between Vanguard's fee structure and that of funds, like iShares, that take a substantial cut of securities lending profits as follows:

> A few exemplary firms, like T. Rowe Price Group and Vanguard Group, rebate all securities lending income (net of expenses) back to the funds that generated it.  The total cost of Vanguard's securities-lending program is well under 1%, says Tom Higgins, chief financial officer of the funds.  That suggests that most of the 30%-to-50% toll charged by other fund managers is pure profit – in effect, money for nothing.[34]

84.    The "100% to investors" standard set by funds such as Vanguard has been mandated by the European Securities Markets Authority ("Esma").  Starting in February 2013, "European fund managers will have to return all profits made from securities lending transactions to their investors," in keeping with new Esma rules announced on July 25, 2012.[35]

85.    News accounts have observed that "[t]he new rules [requiring that 100% of securities lending profits go to investors] present a particular challenge to the business model of BlackRock … which earns significant revenues from securities lending transactions undertaken by its iShares exchange traded funds operations in Europe."[36]

86.    The 60/40 split between iShares and BTC is disproportionately large, bearing no reasonable relationship to the services rendered or costs incurred in conducting the lending.

87.    The 60/40 split between iShares and BTC was not the product of arm's-length bargaining and is significantly larger than the securities leading fee that would be negotiated at arms length.

---

[34] Zweig, *supra.*
[35] Chris Flood, "Fund managers to lose securities lending profits," Financial Times (July 25, 2012).
[36] Flood, *supra.*

*Breach 2 – BFA's inflated charges for investing collateral owned by the Funds*

88.     A second manner in which Plaintiffs and other holders of the Funds are denied their rightful returns on their investments is through self-dealing by BFA in its management of collateral provided by securities borrowers who have borrowed shares owed by those Funds.

89.     iShares Trust's Registration Statement filed on January 12, 2012 confirms that cash collateral from securities lending "may be reinvested in certain short term instruments either directly on behalf of the fund or through one or more joint accounts or money market funds, including those affiliated with BFA; such reinvestments are subject to inherent risks" and states that "BFA may receive compensation for these investments."[37]

90.     On information and belief, BFA does receive compensation for investing collateral provided by securities borrowers in connection with borrowing securities from the Funds. BFA's fees are part of a fee structure that, at minimum, results in the 40% split that BlackRock confirms its affiliates take from the revenues derived from lending securities owned by Fund investors.

91.     It has been empirically established that "investing the collateral that borrowers commit to secure security loans with affiliated agents … [like BFA] is associated with lower security lending returns." [38]

92.     BFA's fees for investing collateral are part of a scheme that generate disproportionately high fees for BFA, BTC and other BlackRock affiliates and thereby does create vastly lower securities lending returns for Plaintiffs and other fund investors than they would receive under a security lending agreement negotiated at arms length.

---

[37] iShares Trust, Form N-1A, p.5, filed January 30, 2012.
[38] Adams Study, *supra*. at 17.

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 22 of 47 PageID #: 22

*Breach 3- requiring Funds to pay excessive fees to borrowers*

93.    The 60/40 split demanded by BTC, BFA and other BlackRock affiliates, does not, on information and belief, account for fees paid to securities borrowers.  Not only does each Fund pay BlackRock affiliates a 40% cut of all securities lending revenue as a fee for its securities lending services, but, at times, the *Fund also pays each borrower a fee* for simply borrowing the fund's securities.

94.    iShares Trust has issued a "Statement of Additional Information (as revised August 1, 2012) confirming the arrangement whereby Funds pay fees to borrowers of the Funds' securities:

> With respect to loans that are collateralized by cash, the borrower will be entitled to receive a fee based on the amount of cash collateral.  The Funds are compensated by the difference between the amount earned on the reinvestment of cash collateral and the fee paid to the borrower.  In the case of collateral other than cash, a Fund is compensated by a fee paid by the borrower equal to a percentage of the market value of the loaned securities...Each Fund pays a portion of the interest or fees earned from securities lending to a borrower as described above and to a securities lending agent who administers the lending program in accordance with guidelines approved by the Trust's Board of Trustees."[39]

95.    Because iShares does not disclose the identities of borrowers in its securities lending program, Plaintiffs cannot, at this time, allege precisely how many borrowers of fund assets were affiliated with BFA, BlackRock, Inc., or Defendant Directors, either directly or indirectly.  However, according to iShares' limited disclosures, it is clear that at least some of the revenue generated by iShares' securities lending program is paid to BlackRock, BFA or BTC, through borrowing affiliates, in the form of fees paid to borrowers.

96.    For example, the 2012 Prospectuses of certain of the Funds state that "one or more Affiliates may be among the entities to which the Fund may lend its portfolio securities

---

[39] iShares Trust, Statement of Additional Information, p 6 (as revised August 1, 2012)(emphasis supplied).

under the securities lending program."[40]  The Prospectus defines "Affiliates" to include "BlackRock and the PNC Financial Services Group, Inc. and each of their affiliates."

97.  On information and belief, the Funds, at the direction of BTC, pay BlackRock affiliates for borrowing securities, thereby effectively increasing BlackRock's cut of securities lending revenue beyond even the disproportionally large 40% share BlackRock admits in its public statements.

<u>The Role of an ETF's Board of Trustees</u>

98.  The Board of iShares, like the governing boards of all investment companies, is charged by Congress with being a "watchdog" over the interests of its investors, which interests can be boiled down to the maximization of returns on their investment.

99.  One of the watchdog duties of an ETF's Board is to approve the agreement entered into with the chosen securities lending agent and to oversee the agent's performance of its obligations under the agreement.

100.  Even if the SEC permits an affiliate to act as the securities lending agent for a particular fund, that permission does not eliminate or lessen the fiduciary duties imposed by the Act on the parties.  The boards of directors of investment companies are fiduciaries of their investors' funds, and they are charged with protecting investors' interests over the interests of all others.

101.  The board of directors of an investment company has a fiduciary obligation to ensure that the compensation paid to any service provider, especially one affiliated with the fund or its sponsor, is not excessive and is within the range of what would have been negotiated at arm's length between non-affiliated parties.

---

[40] *See*, *e.g.*, 2012 Prospectus, iShares Russell Midcap Index Fund, p. 10 (August 1, 2012)

102. The iShares Board consists of nine (9) Directors, each of whom is charged with the management of investor funds, which includes the supervision of iShares service providers, including both BFA and BTC. The iShares Board oversees 218 funds comprising the iShares ETF group.

103. Many of the Defendant Directors serve on the boards of other investment companies or other institutions, and thus they have fiduciary obligations to more than the 218 iShares funds within their purview. The Defendant Directors who are held out as "independent" receive substantial compensation from iShares funds, including the Funds. The "interested directors" have a direct pecuniary interest in furthering Defendants scheme to overcharge iShares funds for services, thereby benefitting BlackRock and various affiliates at the expense of those funds.

104. Given the time demands on Defendant Directors' schedules, combined with the number of funds they oversee, as well as the substantial compensation the Defendant Directors receive from iShares and related entities, iShares Directors are either unable or unwilling to competently oversee the activities of iShares's service providers and thus fulfill their fiduciary duties.

105. The interrelationship between iShares, the Defendant Directors, BFA, and BTC creates conflicts of interest that taint any securities lending agreement that is "negotiated" among the parties.

106. Due to their conflicts of interest, in addition to their multiple board appointments and other professional duties, iShares Directors are unable to competently oversee lending activities necessary to safeguard investors' interests under a non-transparent, non-arm's-length arrangement and thus fulfill their fiduciary duties.

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 25 of 47 PageID #: 25

107. By approving the excessive compensation arrangement with BTC, the Defendant Directors breached the fiduciary duties owed to iShares' investors.

## CAUSES OF ACTION

### COUNT I
### (Section 36(b) of the Investment Company Act)
### Derivative Claim

### Compensation to BTC and BFA for securities lending is excessive

108. The allegations in paragraphs 1 through 108 are incorporated and made a part of Count I as if fully re-alleged herein.

109. Pursuant to 15 U.S.C. § 80a-35(b), this count is asserted derivatively "on behalf of" nominal Defendants iShares Trust and iShares Inc. and the Funds.

110. This count is asserted against Defendants BTC and BFA as the primary recipients of compensation for services and payments of a material nature, including fees for securities lending services provided and fees for investing collateral provided by borrowers of securities.

111. This Count is asserted against the Defendant Directors for having breached their fiduciary duties to the investors with regard to compensation for and payment to BFA and BTC for their services.

112. BTC is an investment adviser, under the Act, to iShares and the Funds, as it regularly advises iShares on investment strategies, including but not limited to the purchase, sale, and loan of fund securities pursuant to its agreement with iShares. BTC is also an "affiliated person" of BFA under the Act.

113. BFA is an investment adviser, under the Act, to iShares and the Funds, as it regularly advises iShares on investment strategies. BFA and its affiliated entities receive compensation from the revenues generated on the lending of Fund assets. BFA is also an "affiliated person" to BTC under the Act.

114.  BTC acts as securities lending agent for iShares and the Funds, subject to the overall supervision of BFA, BTC's wholly-owned subsidiary.[41]

115.  Section 36(b) of the Act expressly makes BTC and BFA fiduciaries to iShares investors with respect to the receipt of compensation for services or for payments of a material nature paid by iShares. 15 U.S.C. § 80a-35(b).

116.  Under the Act, fiduciaries must ensure that any securities lending agreement must provide for compensation to the agent that is fair, transparent, comparable to an agreement formed at arm's length, and in the investors' best interests.

117.  Defendant Directors approved the compensation arrangement between iShares (or the individual funds) and BTC, including, without limitation, the fee split between the investors and BTC.  Under that fee arrangement, BTC received a direct cut of thirty-five percent of all revenue from lending the Funds' securities – a fee vastly higher than would be obtained through arms-length bargaining.

118.  In addition, Defendant Directors approved arrangements giving rise to additional compensation to BlackRock affiliates which account for what Blackrock admits is a forty percent cut of securities lending revenues for BlackRock and affiliates.

119.  The actual proceeds of the entire short-sale transactions are taken from  iShares funds, including the Funds, at many stages and are conferred directly to BTC, BFA and its affiliates, including, without limitation, the affiliated hedge funds.

120.  The forty-percent total cut claimed publicly by BlackRock and its affiliates is vastly higher than would be obtained through arms-length bargaining.

121.  BTC was wrongfully enriched through its agreement with iShares at the expense of investors.  Its compensation was so disproportionately large that it bore no reasonable rela-

---

[41] http://uk.ishares.com/en/pc/stream/pdf/-/publish/repository/documents/en/downloads/sai_us_ishares_trust_5.pdf

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 27 of 47 PageID #: 27

tionship to the value of the services rendered and could not have been the product of arm's length bargaining. This receipt of compensation constitutes a breach of BTC's duties to the investors under the ICA.

122. BFA and affiliated entities were wrongfully enriched through their borrowing activities with iShares at the expense of iShares investors and through BFA's fees for investing collateral provided by securities lenders.

### The compensation to BTC and BFA for securities lending bears no relationship to the serviced rendered.

*Nature and Quality of Services*

123. The nature and quality of the securities-lending services provided by BTC and BFA to iShares is worse than those offered by independent securities-lending agents on transactions involving independent third parties.

124. The deficiencies in services offered by BTC and BFA include, without limitation, exposing investors to increased risk without providing commensurate compensation by structuring securities lending operations to maximize investment collateral from securities borrowers in a manner that delivers inadequate returns. BTC and BFA seek to expand the volume of securities lending transactions rather than to maximize profits to Fund investors by focusing profitable lending transactions.

125. On average, funds with self-administered lending programs earn 0.93% on lent securities while only lending out 2.8% of assets. Funds with unaffiliated lending agents earn 0.49% on lent securities while only lending 5% of assets.

126. On average, iShares ETFs lend 20% of securities they own.[42]

---

[42] http://citywire.co.uk/money/BlackRock-protects-ishares-etfs-from-stock-lending/a597719

127. iShares executive Joe Linhares confirmed this 20% figure when talking with representatives of the Financial Times in June, 2012.[43]

128. This average likely understates the scope of iShares' securities lending transactions. Much of BTC's lending activities on behalf of iShares occur on an intra-reporting period basis so as to avoid disclosure requirements.

129. For one iShares ETF, "data at the end of September 2012 reveals that almost 69% of the fund's net assets were lent out on average last year with a maximum percentage lent on any single day of 95%."[44]

130. The percentage of iShares assets on loan is more than 7 times the industry average for self-lending funds,[45] four times higher than funds using unaffiliated agents,[46] and more than double the industry average for funds using affiliated lending agents.[47]

131. The returns from securities lending activities that iShares funds generate are not proportional to the level of securities lending that the funds are engaged in. Because lent assets are collateralized by cash, and that cash is reinvested at money market rates, an increase in lent assets should create a corresponding increase in returns for fund investors. No such increase in returns exists.

132. The sheer volume of iShares' assets out on loan should be accompanied by an equivalent amount of cash collateral to reinvest. This reinvestment should generate incremental returns for iShares funds, but no such returns exist.

---

[43] Chris Flood, "BlackRock tightens securities lending standards," Financial Times (June 22, 2012).
[44] http://www.morningstar.at/at/etf/snapshot/snapshot.aspx?id=F0GBR054WW&tab=11&reportlang=en
[45] Adams, Study, *supra* ("Funds that act as their own agent (self lending agents) only lend about 2.8% of fund assets.")
[46] Adams, *supra.*
[47] Adams, *supra.*

133. The reinvestment of 20% of iShares assets should generate higher returns for iShares funds rather than higher fees for BTC, BFA, and their affiliates.

134. iShares investors are not compensated for the dramatic increase in risk associated with high levels asset lending. Even if no additional risk were associated with increased asset lending, the returns that should naturally flow from interest on collateral obtained in connection with increased lending are rightfully due to the owners of the lent securities – Fund investors – not BTC and BFA.

135. The nature and quality of the "lending services" rendered by BTC and BFA on transactions involving BTC- and BFA-affiliated ETF's entities as borrowers are even less adequate because already low securities lending returns are exacerbated by conflicts of interest.

136. BTC and BFA "negotiate" borrower's premiums and fees with conflicted, affiliated parties at the expense of iShares investors.

137. Likewise, because BFA and affiliated entities provided no additional service to iShares in exchange for receiving a borrower's fee (or paying a lower premium), the nature and quality of those services is not commensurate with the price charged for those services.

138. Investors in iShares funds pay at least a 40% fee for securities lending services that are inferior to securities lending services provided to investors in funds that pay the many times lower fees standard to the industry.

139. Investors in iShares funds pay at least a 40% fee for securities lending services that are inferior to securities lending services provided by funds like Vanguard that charge no fee and pass all revenues derived from lending mutual fund owned shares to the investors in those funds.

*Profits provide an incentive for self dealing*

140. Securities lending is extremely profitable to BTC. BTC received more than $45 million last year in fees associated with the individual funds held by The Pension Plans.

141. Company wide, BlackRock, Inc. had a securities loan balance of $120 billion and earned $397 million in securities lending fees in 2011.

142. BlackRock earned $157 million on securities lending fees in the second quarter of 2012 alone.

143. Because of the lack of transparency by iShares, Plaintiff lacks adequate information to quantify the precise annual profits derived by BFA, BTC and their affiliates from borrower's fees and reduced premiums, although that profit is likely proportionate to the amount of assets borrowed by those entities.

144. The extensive profits generated by securities lending provide a powerful incentive to BFA, BTC and the Defendant Directors to breach their fiduciary duty through excessive securities lending fees.

*Fall Out Benefits provide an incentive for self-dealing*

145. In addition to borrowers' fees, BFA and affiliated entities generate revenue by re-investing the cash collateral collected from securities borrowers into short-term BlackRock, Inc.-affiliated investment vehicles such as money market accounts.

146. Those proceeds represent additional fall out benefits that BFA receives as a result of its participation in the iShares securities-lending operation.

147. BFA and BlackRock generate additional daily returns and fees on an average of $120 billion in cash collateral from the iShares securities lending program.

148. The investment of this collateral represents a 50% increase in the assets under management for the cash management arm of BlackRock and enables it to seek additional investment opportunities.

149. BFA, BTC, BlackRock, Defendant Directors, and their affiliates also generate untold returns from their short-selling operations that are enabled through their borrowing of iShares assets.

150. Those benefits encourage BFA, BTC, and Defendant Directors to shirk the fiduciary duties they owe to iShares shareholders and engage in transactions that maximize their own revenues.

*iShares investors gain no benefits from economies of scale*

151. Because of the number and size of individual iShares funds that engage in securities lending through BTC, iShares is in a position to capitalize on economies of a large scale in the administration of lending activities.

152. For example, BTC, as lending agent, negotiates the terms of a loan, including fee level, collateral, and timeline, with the borrower. Because many borrowers are repeat borrowers, in particular, a small number of institutional investors and banks (some of whom are affiliated with BFA), BTC would not need to renegotiate afresh for each loan transaction.

153. In addition, BTC executes its securities lending trades on a single, firm-wide platform.

154. The 2012 Finadium Survey confirms the presence of economies of scale which allow large holders of securities to obtain superior securities lending returns, noting that revenues generated by smaller plans requires greater work on the part of securities lending agents

such that such smaller plans must generally pay more to securities lending agents than larger plans.[48]

155. The iShares securities lending operations for the more than 440 funds with assets totaling over $480 billion are consolidated into a single operation.

156. BTC and BFA do not pass on these economies of scale to fund investors. Each iShares ETF must pay 40% of its returns to BTC regardless of the size of the operation.

*iShares investors pay vastly higher fees than investors in competitive funds*

157. In light of the 60/40 securities lending revenue split between iShares and BTC, as compared to the 90/10 majority practice detailed in the 2012 Finadium Survey, or the 100/0 split in favor of funds, (such as Vanguard, that arrange securities lending in-house), iShares pays fees that could not have been the product of arm's length bargaining.

158. BTC and BFA receive fees that far exceed those charged by independent securities lending agents.

159. For hard-to-find securities, BTC causes iShares to collect fees from BFA and its affiliates that are far below the fees that an unaffiliated entity would pay. This causes iShares to undercharge for use of its securities to the detriment of investors.

160. The majority of cash collateral proceeds are not being returned to iShares funds, including the Funds, but rather are being pocketed by BTC, BFA, and their affiliates through a variety of conflicted transactions.

*Defendant Directors are neither conscientious nor independent*

161. Defendant Directors did not conduct due diligence in ascertaining the true value of BTC's securities lending services to iShares or ignored evidence of true value.

---

[48] Galper, *supra.*

162. The resulting agreement between BTC and iShares was not the product of arm's length negotiation, and was not entered into openly and transparently.

163. Defendant Directors have also permitted BFA to strip investors of securities lending revenues that are rightly theirs by permitting BFA and affiliates to engage in transactions, including but not limited to, investing collateral provided by securities borrowers, not structured to maximize returns to iShares investors.

164. As a result, iShares investors did not reap the full benefits from the securities lending activity that they could have under a fairly bargained lending-agent contract.

165. These omissions constitute breaches of the Directors' fiduciary duties under the Act.

166. The Funds are entitled to recover the securities lending revenue wrongfully expropriated by BFA, BTC and affiliates.

167. Because the Pension Plans own shares of the Funds, which are part of an "Exchange-Traded Fund Complex" managed by the same Defendant Directors and subject to the terms of the same Securities Lending Agreement with BTC, the Pension Plans can properly pursue the interests of all shareholders in iShares exchange traded funds, all of which have suffered the same harm from Defendants' unlawful conduct.

168. The Pension Plans have not made demand on the iShares Board to institute this action or other corrective action because the Act does not require demand, but instead grants investors the ability to seek redress for the wrongdoing of Directors and fund advisers without any pre-complaint demand on directors.

169. Even if demand were required, it would be futile because the Board is incapable of making an independent and fair decision given the conflicts of interest just described, in-

cluding receipt of substantial compensation from iShares funds, including the Funds, and related entities. Likewise, any demand on shareholders would require the Directors to sue themselves and would be futile.

## COUNT II
### (Section 47(b) of the Investment Company Act)
### <u>Derivative Claim</u>

170. The Pension Plans expressly incorporate paragraphs 1 through 169 into Count IV as if fully re-alleged herein.

171. This count is asserted derivatively on behalf of iShares and the individual Funds in which the Pension Plans own shares.

172. Pursuant to Section 47(b) of the Act, 15 U.S.C. 80a-46(b), any contract made in violation, or performance of which results in violation, of the Act is declared unenforceable.

173. For the reasons alleged herein, the Amended and Restated Securities Lending Agency Agreement between, *inter alia*, iShares and BTC, and the Investment Advisory Agreements between BFA and iShares Trust, and BFA and iShares, Inc., and any other agreements obligating iShares or any Fund to pay BTC or BFA or affiliates fees arising out of securities lending transactions (taken together "the Unenforceable Contracts"), were performed in violation of the Act and are therefore unenforceable.

174. Under Section 47(b) of the Act, 15 U.S.C. 80-46(b), the Unenforceable Contracts should properly be voided, and BTC, BFA, and other affiliates be held liable to return to the funds and fund investors all of the fees and consideration of any kind paid to them during the time period that violations occurred.

175. The Unenforceable Contracts were made in violation of at least four provisions of the Act – Sections 17(d), 17(e), 36(a) and 36(b) – each of which is addressed below. Each vio-

lation provides a basis for rescission of the Unenforceable Contracts pursuant to Section 47(b) of the Act.

*Section 17(d) violation*

176.  iShares could not use BTC or another affiliate as a securities lending agent without SEC approval.

177.  iShares' use of affiliate BTC as a lending agent would be *per se* unlawful under the Act but for iShares' representation to the SEC that its Directors would faithfully carry out their fiduciary duty to ensure that fees paid to BTC were reasonable.

178.  iShares has itself admitted that its use of BTC – an affiliate – as a securities lending agent implicate Section 17(d) of the Act, which "prohibit any affiliated person of … a registered investment company or any affiliated person of such person … from effecting any transaction … in which the investment company participates."[49]

179.  The Act gives the SEC broad authority to issue exemptions from the Act's provisions to the extent "necessary or appropriate and in the public interest and consistent with the protection of investors."  15 U.S.C.S. § 80a-6(c).

180.  BlackRock, acting on its own behalf as well as that of BFA, BTC and certain other affiliates, has obtained a letter from the SEC ("SEC Letter") exempting its otherwise unlawful use of an affiliated lending agent based in part on its representation that "the fees for [its securities lending agent's] services are fair and reasonable in light of the usual and customary charges imposed by others for services of the same nature and quality."[50]

---

[49] SEC Release No. IC-25062 regarding Apex Municipal Fund, Inc., et al.; Notice of Application, Fed. Reg. Vol. 66, No. 138, p. 37501 (July 18, 2001); applied to iShares by correspondence from Marilyn Mann, Senior Counsel, Office of Investment Company Regulation (September 27, 2006).
[50] *Id.* at 37503

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 36 of 47 PageID #: 36

181. Even where granting exemptive relief from the statutory prohibition against affiliated securities lending agents, the SEC does so only in light of the fact that "[a] Fund's board of directors has a fiduciary obligation to ensure that compensation paid to any service provider, especially one that is affiliated with the Fund or its adviser, is not excessive [and that such] compensation would be subject to section 36(b) of the Investment Company Act and, therefore, must fall within the range of what would have been negotiated by the parties at arm's length."[51]

182. BlackRock's representation to the SEC that compensation paid to its securities lending agent – BTC – is "fair and reasonable in light of the usual and customary charges imposed by others for services of the same nature and quality" is false.

183. BTC, BFA and other BlackRock affiliates cannot rely on the SEC Letter, which is based on their false assurances to the SEC that securities lending fees derived from securities owned by iShares and the Funds would be fair and reasonable.

184. In fact, the 60/40 split iShares charges its customers bears no relationship to the fee arrangements that would be negotiated at arms-length. As demonstrated by the Finadium Report, a major fund provider like iShares would negotiate, at a minimum, a split consistent with that obtained by a "majority" of large funds – 90/10.[52] Confirming Finadium's view of the industry standard, industry observers have concluded that the securities lending fees paid out by iShares are "about three times more than what is typical in the industry."[53] Other industry observers have characterized iShares excessive fees as "money for nothing."[54]

185. Because they cannot properly rely on the SEC Letter, iShares, BTC and BFA, among others, violated Section 17(d) of the Act by entering into the Unenforceable Contracts.

---

[51] Norwest Bank, *supra,* at 5.
[52] Galper, *supra*, at 20.
[53] McLaughlin, *supra.*
[54] Zweig, *supra.*

186. Defendant Directors have failed to act in the best interests of shareholders in approving the Unenforceable Contracts.

187. Because the Unenforceable Contracts violate Section 17(d) of the Act, they should be rescinded pursuant to Section 47(b). All proceeds obtained by BFA, BTC and other BlackRock affiliates pursuant to these agreements should properly be returned to investors in iShares Funds that were parties to the Unenforceable Contracts.

### Section 17(e) violation

188. Pursuant to Section 17(e) of the Act, 15 U.S.C. 80a-17(e), affiliated persons of registered investment companies, or affiliates of such persons, may not receive compensation for the purchase and sale of any property controlled by such registered investment company.

189. The SEC has determined that "where an affiliated person of an investment company negotiates and accepts a fee for arranging a loan of the fund's securities, the transaction presents the potential for conflict of interest that Section 17(e) was designed to address."[55]

190. iShares's use of affiliates – BTC and BFA – to arrange the loan of iShares funds' securities is a *per se* violation of the Act absent SEC approval.

191. The SEC Letter obtained by BlackRock does not address Section 17(e) of the Act.

192. On information and belief and based on a telephone conference between Plaintiffs Counsel and the SEC, it appears that neither BlackRock nor any BlackRock affiliate has obtained a letter from the SEC addressing application of Section 17(e) to securities lending transactions involving securities owned by iShares funds.[56]

---

[55] Response of Office of Chief Counsel, SEC, to United Services Funds, Ref. No. 920573-CC (April 23, 1993). http://www.sec.gov/divisions/investment/noaction/1993/unitedservices042393.pdf

[56] This allegation is made on information and belief based on a good faith review of SEC records and other publicly available documents.

193. Even if such an exemption had been issued by the SEC, iShares payment of disproportionate fees not anticipated by or authorized by the SEC would be unauthorized and would render iShares use of affiliates to lend securities unlawful and in violation of Section 17(e).

194. The SEC is particularly concerned about the conflicts of interest associated with affiliated lending agents in securities lending programs.

195. The SEC has ceased issuing exemptive orders allowing affiliated lending agents to engage in revenue-sharing compensation out of concern that the bargaining process with affiliates presents an insurmountable conflict of interest.[57]

196. iShares's use of an affiliate, BTC, to manage securities lending transactions involving securities owned by iShares funds violates Section 17(e) of the Act.

197. BTC, BFA, and their affiliates profit and receive compensation from the purchase and sale of iShares securities through their involvement in the iShares securities lending program to the detriment of the shareholders of iShares.

198. Because iShares cannot properly use affiliates to manage the lending of iShares funds' securities, iShares, BTC and BFA violated of Section 17(e) of the Act by entering into the Unenforceable Contracts.

199. Defendant Directors have failed to act in the best interests of shareholders in approving the Unenforceable Contracts.

200. Because the Unenforceable Contracts violate Section 17(e) of the Act, they should be rescinded pursuant to Section 47(b). All proceeds obtained by BFA, BTC and other BlackRock affiliates pursuant to these agreements should properly be returned to investors in iShares Funds that were parties to the Unenforceable Contracts.

---

[57] http://www.sec.gov/comments/4-590/4590-21.pdf

Case 3:13-cv-00046   Document 1   Filed 01/18/13   Page 39 of 47 PageID #: 39

*Section 36(a) violation*

201.  BTC is an investment adviser under the Act to iShares.  It regularly advises iShares on investment strategies, including but not limited to the purchase, sale, and loan of fund securities pursuant to its agreement with iShares.

202.  BFA is an investment adviser under the Act to iShares; BFA and its affiliated entities receive compensation for borrowing services from the revenues generated on the lending of fund assets.

203.  Section 36(a) of the Act expressly imposes fiduciary duties upon BTC, BFA, and Defendant Directors in respect to iShares and its investors.

204.  BTC, BFA, and Defendant Directors breached their fiduciary duties arising under Section 36(a) of the Act by approving, authorizing, and causing shareholder property to be lent at prices below that which would be negotiated in arm's length transactions to affiliated entities of BTC, BFA, and Defendant Directors, causing a loss to the investors in the funds.

205.  BTC, BFA, and Defendant Directors breached their fiduciary duties arising under Section 36(a) of the Act by investing collateral received in short-sale operations with conflicted affiliates for returns that were knowingly below that which would be negotiated in arm's length transactions, causing a loss to the investors in the funds.

206.  BTC, BFA, and Defendant Directors breached their fiduciary duties arising under Section 36(a) of the Act by placing their own interests and the interests of their affiliated entities above the interests of iShares and its investors through the administration of the iShares securities lending operations.

207.  The level of self dealing between BTC, BFA, Defendant Directors and their affili-

ated entities in the iShares securities lending program caused shareholder returns from the

program to be far below the returns that would have resulted from arm's length transactions.

208.  BTC, BFA, and Defendant Directors breached their fiduciary duties by subjecting

iShares investors to unreasonable risk of loss under the securities lending program without ad-

equately compensating investors for that risk.

209.  BTC, BFA, and Defendant Directors, breached their fiduciary duties by using in-

vestor assets for the benefit of their hedge funds and short-selling operations, without compen-

sating investors in line with compensation that would have been paid based on arm's length

transactions.

210.  Because the Unenforceable Contracts violate Section 36 (a) of the Act, they

should be rescinded pursuant to Section 47(b).  All proceeds obtained by BFA, BTC and other

BlackRock affiliates pursuant to these agreements should properly be returned to investors in

iShares Funds that were parties to the Unenforceable Contracts.

*Section 36(b) violation*

211.  BTC, BFA and the Defendant Directors have violated Section 36(b) as described

in support of Count I of this Complaint.

212.  Because the Unenforceable Contracts violate Section 36(b) of the Act, they

should be rescinded pursuant to Section 47(b).  All proceeds obtained by BFA, BTC and other

BlackRock affiliates pursuant to these agreements should properly be returned to investors in

iShares Funds that were parties to the Unenforceable Contracts.

*Section 47(b) remedy for violation of Sections 17(d) and (e) and Section 46 (a) and (b)*

213. Because the Unenforceable Contracts violate Sections 17(d) and (e) and 36(a) and (b) of the Act, they should be rescinded pursuant to Section 47(b). All proceeds obtained by BFA, BTC and other BlackRock affiliates pursuant to these agreements should properly be returned to investors in iShares Funds that were parties to the Unenforceable Contracts. Plaintiffs should be further entitled to any other rescission damages that this Court deems appropriate.

214. Because the Pension Plans own shares of the Funds, which are part of an "Exchange-Traded Fund Complex" managed by the same Defendant Directors and subject to the terms of the same Securities Lending Agreement with BTC, the Pension Plans can properly pursue the interests of all shareholders in iShares exchange traded funds, all of which have suffered the same harm from Defendants' unlawful conduct. Rescission of the Unenforceable Contracts will impact and benefit all shareholders of the funds in the "Exchange Traded Fund Complex."

215. The Pension Plans have not made demand on the iShares Board to institute this action or other corrective action because the Act does not require demand, but instead grants investors the ability to seek redress for the wrongdoing of Directors and fund advisers without any pre-complaint demand on directors.

216. Even if demand were required, it would be futile because the Board is incapable of making an independent and fair decision given the conflicts of interest just described, including receipt of substantial compensation from iShares funds, including the Funds, and related entities. Likewise, any demand on shareholders would require the Directors to sue themselves and would be futile.

## COUNT III
### (Section 36(a) of the Investment Company Act)
### <u>Derivative Claim</u>

217. The Pension Plans expressly incorporate paragraphs 1 through 216 into Count III as if fully re-alleged herein.

218. This count is asserted on behalf of the individual Funds of which Plaintiffs own shares.

219. This count is asserted derivatively on behalf of iShares and the Individual Fund Defendants against Defendants BTC and BFA as the recipients of proceeds from lending services provided, reduced prices for short-sale operations (whether through reduced premiums or higher rebates), and related proceeds from securities lending, and it is also asserted against the Defendant Directors.

220. BTC, BFA, and Defendant Directors breached their fiduciary duties by using investor assets for the benefit of their hedge funds and short-selling operations, without compensating investors in line with compensation that would have been paid based on arm's length transactions.

221. The Funds are entitled to recover the securities lending revenue wrongfully expropriated by BFA, BTC and affiliates.

222. Because the Pension Plans own shares of the Funds, which are part of an "Exchange-Traded Fund Complex" managed by the same Defendant Directors and subject to the terms of the same Securities Lending Agreement with BTC, the Pension Plans can properly pursue the interests of all shareholders in iShares exchange traded funds, all of which have suffered the same harm from Defendants' unlawful conduct.

223. The Pension Plans have not made demand on the iShares Board to institute this action or other corrective action because the Act, and other law on which Plaintiffs rely, do not require demand, but instead grant investors the ability to seek redress for the wrongdoing of Directors and fund advisers.

224. Even if demand were required, it would be futile because the Board is incapable of making an independent and fair decision given the conflicts of interest described in the preceding paragraphs , including receipt of substantial compensation from iShares funds, including the Funds, and related entities.  Likewise, any demand on shareholders would require the Directors to sue themselves and would be futile.

225. The damages resulting from these breaches of fiduciary duties are the difference between the actual revenue earned from the securities lending program and the revenue that would have been earned had the securities lending transactions been conducted at arm's length.

**WHEREFORE** The Pension Plans request the following forms of relief:

1. An injunction enjoining Defendants from continued lending of iShares securities absent a fairly and openly negotiated contract between iShares or individual funds and an independent lending agent; and

2. Rescission of the Unenforceable Contracts and an award of appropriate recissionary damages; and

3. Monetary damages to iShares funds, including the Funds, for the benefit of fund investors,  resulting from the breaches alleged herein; and

4. Disgorgement of revenue from securities lending; and

5. An award of Plaintiffs' costs and reasonable attorney's fees; and

6. Any such further relief the Court may deem lawful.

44

Dated January 18, 2013                    Respectfully submitted,

**BRANSTETTER, STRANCH & JENNINGS, PLLC**


  /s/ Michael G. Stewart
J. Gerard Stranch IV, BPR # 023045
Michael G. Stewart, BPR # 016920
Karla M. Campbell, BPR # 027132
227 Second Avenue North
Nashville, TN 37201
Tel:  (615) 254-8801
Fax:  (615) 255-4319
gstranch@branstetterlaw.com
mstewart@branstetterlaw.com
kcampbell@branstetterlaw.com


**THE PICKRELL LAW GROUP, P.C.**
C. Mark Pickrell, BPR # 015605
William G. Brown, BPR # 029072
Andrew E. Hill, BPR # 031156
5701 Old Harding Pike
Suite 200
Nashville, TN 37205
Tel:  (615) 352-9588
mark.pickrell@pickrell-law.net
will.brown@pickrell-law.net
drew.hill@pickrell-law.net

*Attorneys for Plaintiffs*

## VERIFICATION

I, _JAMES P. SULLIVAN_, hereby declare as follows:

I am authorized to verify this Complaint on behalf of Labor's Local 265 Pension Fund ("Laborers' Plan"), a shareholder of iShares, Inc. Funds as described herein. Laborers' Plan purchased shares of the Funds and held those shares as set out in the Complaint. I have read the Complaint in the above entitled matter, a substantially similar version of which I understand is to be filed on or about January 16, 2013, and know the contents of it. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing I true and correct.

James P. Sullivan

Dated: Jan. 18, 2013

## VERIFICATION

I, Chris Mayo, hereby declare as follows:

I am authorized to verify this Complaint on behalf of Plumbers and Pipefitters Local No. 572 Pension Fund, a shareholder of iShares MSCI EAFE Index Fund, iShares MSCI Emerging Markets Index Fund, iShares Russell 2000 Growth Index Fund, iShares Russell 2000 Value Index Fund, iShares Core S&P Mid Cap, iShares Core S&P Small-Cap, and iShares Dow Jones U.S. Real Estate Index Fund as described herein. Plumbers and Pipefitters Local No. 572 Pension Fund purchased shares of the Funds and held those shares as set out in the Complaint. I have read the Complaint in the above entitled matter, a substantially similar version of which I understand is to be filed on or about January 17, 2013, and know the contents of it. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing I true and correct.

_Chris Mayo_

Dated: 1-17-2013

1