# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

LABORERS' LOCAL 265 PENSION FUND ) 
and PLUMBERS AND PIPEFITTERS )
LOCAL NO. 572 PENSION FUND, )
                              )
      Plaintiffs, )      No. 3:13-cv-00046
                              )
v. )      Judge Trauger
                              )      Magistrate Judge Knowles
iSHARES TRUST, et al., )
                              )
      Defendants. )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**BRANSTETTER, STRANCH**
  **& JENNINGS, PLLC**
James G. Stranch, BPR #002542
J. Gerard Stranch IV, BPR # 023045
Michael G. Stewart, BPR # 016920
Michael J. Wall, BPR #024774
227 Second Avenue North
Nashville, TN 37201
Tel: (615) 254-8801

**ROBBINS ARROYO LLP**
Brian J. Robbins (admitted *pro hac vice*)
Craig W. Smith (admitted *pro hac vice*)
Jenny L. Dixon (admitted *pro hac vice*)
600 B. Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990

**THE PICKRELL LAW GROUP, P.C.**
C. Mark Pickrell, BPR # 015605
William G. Brown, BPR # 029072
Andrew E. Hill, BPR # 031156
5701 Old Harding Pike
Suite 200
Nashville, TN 37205
Tel: (615) 352-9588

*Attorneys for Plaintiffs*

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

SUMMARY OF THE ALLEGATIONS ...............................................................4

ARGUMENT ....................................................................................................6

   I.  PLAINTIFFS STATE A CLAIM UNDER SECTION 36(b) OF THE ICA ......................6

  II.  PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 47(b) OF THE ICA, ASSERTED IN COUNT II ..............................13

  III. PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 36(b) OF THE ICA, ASSERTED IN COUNT III ............................19

  IV. TO THE EXTENT A PRE-SUIT DEMAND REQUIREMENT APPLIES TO COUNTS II AND III, PLAINTIFFS HAVE ESTABLISHED DEMAND FUTILITY ........................................................................20

     A.  No Demand Requirement Applies to Plaintiffs' Section 47(b) Claim, to the Extent it is Based on a Section 36(b) Violation .........................................20

     B.  The Complaint Adequately Demonstrates Demand Futility .......................21

        1.  Governing Legal Standards...................................................................21

        2.  Demand on the Board of iShares Trust is Futile Under Delaware Law Because There is Reason to Doubt That the Board Exercised Valid Business Judgment .....................................21

        3.  Demand on the Board of iShares, Inc. is Futile Under Maryland Law ................24

CONCLUSION..................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001).....................................................................17, 18, 20

*Allaire Corp. v. Okumus*, 433 F.3d 248 (2d Cir. 2006) ...............................................................10

*Bearden v. Honeywell International, Inc.*, No. 3:09-1035, 2010 U.S. Dist. LEXIS 83996
 (M.D. Tenn. Aug. 16, 2010) ...............................................................................................7

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ...............................................................17

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ..................................................................10

*Cleveland v. Policy Management System Corp.*, 526 U.S. 795 (1999) ..........................................7

*Cobb v. Contract Transport, Inc.*, 452 F.3d 543 (6th Cir. 2006).................................................11

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).................................................11, 13, 21, 25

*Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595 (6th Cir. 1982) .............................................8

*Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968) ..........................................................................14

*Frankel v. Hyde*, No. 73-Civ-4665, 1974 U.S. Dist. LEXIS 9144 (S.D.N.Y. 1974)....................12

*Hamilton v. Allen*, 396 F. Supp. 2d 545 (E.D. Pa. 2005).......................................................14, 19

*Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, No. A-06-CA-540-LY,
 2006 U.S. Dist. LEXIS 84028 (W.D. Tex. Nov. 17, 2006)................................................19

*Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, No. A-06-CA-540-LY,
 2007 U.S. Dist. LEXIS 98853 (W.D. Tex. Jan. 23, 2007)................................................19

*Jones v. Harris Associates, L.P.*, 130 S. Ct. 1418 (2010)...........................................................1, 2

*Jones v. Hoel*, 211 F. Supp. 2d 823 (E.D. Tex. 2002) .................................................................25

*Kamen v. Kemper Finance Services*, 500 U.S. 90 (1991).............................................................21

*Lessler v. Little*, 857 F.2d 866 (1st Cir. 1988) ............................................................................14

*Leyse v. Clear Channel Broadcasting, Inc.*, 697 F.3d 360 (6th Cir. 2012) ...................................10

*In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527 (D. Del. 1994) ...................................19

*Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780 (7th Cir. 1977)..................................................14

*McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001).......................................................................21

*McLachlan v. Simon*, 31 F. Supp. 2d 731 (N.D. Cal. 1998) ..............................................19

*In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005) ..................................14

*In re Nuveen Fund Litig.*, No. 94 C 360, 1996 U.S. Dist. LEXIS 8071 (N.D. Ill. June 11, 1996) .........................................................................................................................19

*Olmsted v. Pruco Life Insurance Co.*, 283 F.3d 429 (2d Cir. 2002).......................................16, 17

*In re Regions Morgan Keegan Sec., Derivative & ERISA Litigation*, 743 F. Supp. 2d 744 (W.D. Tenn. 2010) ..................................................................................................14

*Regions Morgan Keegan Sec. v. Sullivan*, No. 10-2188, 2011 U.S. Dist. LEXIS 102967 (M.D. Tenn. Sept. 9, 2011) .......................................................................................24

*Russello v. United States*, 464 U.S. 16 1983) ..........................................................................18

*SEC v. Blackwell*, 291 F. Supp. 2d 673 (S.D. Ohio 2003)...........................................................10

*SEC v. Cavanaugh*, 445 F.3d 105 (2d Cir. 2006) .......................................................................10

*Santomenno ex rel. John Hancock Trust v. John Hancock Life Insurance Co.*, 677 F.3d 178 (3d Cir. 2012) .................................................................................................17, 18

*Scottsdale Insurance Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008) ..............................................7

*Seidel v. Lee*, No. 93-494-JJF, 1994 U.S. Dist. LEXIS 21534 (D. Del. Oct. 14, 1994) ...............19

*Smith v. Franklin/Templeton Distribs., Inc.*, No. C 09-4775, 2010 U.S. Dist. LEXIS 56516 (N.D. Cal. June 8, 2010) ..................................................................................19

*Smith v. Oppenheimer Funds Distributing*, 824 F. Supp. 2d 511 (S.D.N.Y. 2011) .....................18

*Steinberg v. Janus Capital Mgmt., LLC*, 457 Fed. Appx. 261 (4th Cir. 2011).............................17

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997) ..................................................................................................19

*Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671 (E.D. Mich. 2002)..............................................7

*Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977) ...................................................................19

iii

*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ...........................15, 16, 18

*United States v. Blitz*, 533 F.2d 1329 (2d Cir. 1976) ...................................................8

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................................17

*Wiener v. Eaton Vance Distribs. Inc.*, No. 10-10515-DPW, 2011 U.S. Dist. LEXIS 38375
    (D. Mass. Mar. 30, 2011) .................................................................................14

*Young v. Nationwide Insurance Co.*, 2 F. Supp. 2d 914 (S.D. Tex. 1998) ...................19

## STATE CASES

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1980) ...........................................................21

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .......................................................21, 24

*In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del. Ch. 2009) ..............23

*Hanson v. City of Omaha*, 46 N.W.2d 896 (Neb. 1951) ..............................................11

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) ......................................................22

*Lakeview Meadows Ranch v. County of Santa Clara*, 32 Cal. Rptr. 2d 615 (Cal. Ct. App.
    1994) .................................................................................................11

*Michigan Millers Mutual Insurance Co. v. Farm Bureau General Insurance Co.*, 402
    N.W.2d 96 (Mich. Ct. App. 1986) .............................................................11

*Pogostin v. Rice*, 480 A.2d 619 (Del. 1984) ...........................................................21

*In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275 (Del. Ch. 2003) ...............22

*Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008) ....................................................24

*Werbowsky v. Collom*, 766 A.2d 123 (Md. 2000) .....................................................24

## FEDERAL STATUTES

15 U.S.C. § 78t ...........................................................................................15

15 U.S.C. § 80a-6 ....................................................................................11, 12

15 U.S.C. § 80a-15(a)(1) ...............................................................................11

15 U.S.C. § 80a-17 ............................................................................................... passim

15 U.S.C. § 80a-35(b) ......................................................................................... passim

15 U.S.C. § 80a-35(b)(3) ............................................................................................25

15 U.S.C. § 80a-35(b)(4) ..............................................................................................6

15 U.S.C. § 80a-46(b) ...............................................................................15, 16, 18, 19

15 U.S.C. § 80a-48 ......................................................................................................13

15 U.S.C. § 80b-15 .....................................................................................................15

18 U.S.C. § 1961 ........................................................................................................15

42 U.S.C. § 1983 ........................................................................................................15

17 C.F.R. § 270.17d-1 ............................................................................................11, 12

Fed. R. Civ. P. 8(d)(3) ..................................................................................................7

Fed. R. Civ. P. 12(b)(6) ................................................................................................1

Fed. R. Civ. P. 23.1 ................................................................................................1, 21

## MISCELLANEOUS

S. Rep. No. 91-184, 91st Cong., 1st Sess. 16 (1970), *reprinted in* 1970 U.S.C.C.A.N.
    4897.................................................................................................................20

H.R. Rep. No. 96-1341, 96th Cong., 2d Sess. 28-29 (1980), *reprinted in* 1980
    U.S.C.C.A.N. 4800 ........................................................................................20

*Norwest Bank Minnesota, N.A. and Society National Bank*, SEC No-Action Letter (pub.
    avail. May 25, 1995) .................................................................................. passim

Brief of SEC as Amicus Curiae, *Olmsted v. Pruco Life Ins. Co*., 283 F.3d 429 (2d Cir.
    2002) .........................................................................................................16, 18

Notice of Application for Exemption, Investment Company Act Release No. 26,073, 68
    Fed. Reg. 36602 (June 18, 2003) ...........................................................................9

Notice of Application for Exemption, Investment Company Act Release No. 25,840, 67
    Fed. Reg. 72706 (Dec. 6, 2002) ......................................................................8, 9

Notice of Application for Exemption, *Investment Company Act Release No. 25,424*, 67
Fed. Reg. 9010 (Feb. 27, 2002) ........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 25,218*, 66
Fed. Reg. 54313 (Oct. 26, 2001) .......................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 24,404*, 65
Fed. Reg. 25521 (May 2, 2000) .........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 24,126*, 64
Fed. Reg. 61952 (Nov. 15, 1999) .......................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 24,084*, 64
Fed. Reg. 56823 (Oct. 21, 1999) ........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 23,956*, 64
Fed. Reg. 46735 (Aug. 26, 1999) .......................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 22,693*, 62
Fed. Reg. 30902 (June 5, 1997) .........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 22,679*, 62
Fed. Reg. 29165 (May 29, 1997) ........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 22,541*, 62
Fed. Reg. 11232 (Mar. 11, 1997) .......................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 22,181*, 61
Fed. Reg. 46874 (Sept. 5, 1996) ........................................................................9

Notice of Application for Exemption, *Investment Company Act Release No. 21,878*, 61
Fed. Reg. 16658 (Apr. 16, 1996) .......................................................................9

Donna M. Nagy, *Judicial Reliance on Regulatory Interpretation in SEC No-Action
Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921 ...........10

*Webster's Seventh New Collegiate Dictionary* (1970) ................................................11

Pursuant to Fed. R. Civ. P. 12(b)(6) and 23.1, Plaintiffs Laborers' Local 265 Pension Fund and Plumbers and Pipefitters Local No. 572 Pension Fund (collectively, "Plaintiffs"), hereby respond in opposition to the motions to dismiss filed by Defendants iShares Trust, iShares, Inc., the "ETF Defendants," Blackrock Fund Advisors, Blackrock Institutional Trust Company, N.A., Robert S. Kapito, and Michael Latham (Doc. 21) and Defendants Robert H. Silver, George G. C. Parker, John E. Martinez, Cecilia H. Herbert, Charles A. Hurty, John E. Kerrigan, and Madhav V. Rajan (Doc. 24) (collectively, "Defendants").

## INTRODUCTION

Plaintiffs' case involves the routine application of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1, *et seq.* Defendants have engaged in a scheme to siphon off millions of dollars from exchange traded fund ("ETFs") owned by Plaintiffs and other shareholders by charging grossly excessive fees. These fees are ostensibly for securities lending services but, in fact, bear no relation to actual services rendered. The ICA specifically authorizes a cause of action for breach of fiduciary duty against advisors who charge excessive fees, and the Securities and Exchange Commission ("SEC") has long recognized that this cause of action applies to fees for securities lending services—the precise fees at issue in this case. Defendants' novel position that they owe no fiduciary duty under the ICA with respect to their securities lending fees is supported by no case, regulation, or administrative ruling. The SEC's position is correct; under the ICA, Plaintiffs are plainly entitled to recover excessive securities lending fees charged by Defendants.

As the United States Supreme Court has repeatedly observed, Congress designed the ICA to protect investors like Plaintiffs from the conflicts of interest surrounding investment companies. *Jones v. Harris Associates, L.P.*, 130 S. Ct. 1418, 1422 (2010). By their very nature, investment companies create opportunities for self-dealing. *Id.* An investment advisor typically

1

creates the investment company, selects its directors, and manages its investments. *Id.* The normal forces of arm's-length bargaining do not work in this scenario, *id.*, so when the investment company does business with an affiliated entity, a strong temptation arises to act at the expense of investors. Independent academic research confirms that the concerns underlying the ICA apply to securities lending: when investment companies like nominal Defendants iShares, Inc. and iShares Trust (collectively, "iShares") contract with related entities for securities lending, they routinely pay excessive fees and thereby divert funds that rightly belong to investors. ¶¶ 55-59.[1]

This case exemplifies the problem. Whereas some of iShares's major competitors return all of the revenue generated from securities lending to their investors, Defendants have diverted at least 40% of the revenues to themselves. Defendants' lending fees are over 300% greater than the industry norm of 10% for large funds—"money for nothing," in the words of one *Wall Street Journal* columnist. ¶ 83. Defendants' contention, that the ICA somehow does not extend to such grossly excessive securities lending fees, is simply spurious.

With respect to Count I, the SEC has specifically established that securities lending compensation is, as Plaintiffs contend, subject to Section 36(b) of the ICA. *See generally In re Norwest Bank Minnesota, N.A. and Society National Bank*, SEC No-Action Letter (pub. avail. May 25, 1995). *Norwest* is not an isolated administrative statement. It is the SEC's definitive analysis of the ICA's application to securities lending compensation, held out as such on the SEC website and reaffirmed in numerous published Releases, which are legal pronouncements of the agency entitled to the highest level of deference. Defendants' un-cited argument that Plaintiffs' Section 36(b) claim should fail because securities lending compensation is "subject to section 17" is directly contrary to the SEC's view. *Norwest* carefully analyzes the interplay between

---

[1] All "¶ __" or "¶¶ __" references are to Plaintiffs' Verified Complaint (Doc. 1).

ICA Sections 17 and 36(b) and categorically confirms that the latter provision, the basis for Plaintiffs' Count I, applies to securities lending compensation. Defendants do not offer their own interpretation of the ICA to counter that of the SEC or point to any authority supporting their contention that the fiduciary duty imposed by Section 36(b) of the ICA does not apply to them. They simply say that the complaint makes allegations about Section 17. This pleading argument goes nowhere. Plaintiffs have the right to plead alternative theories of recovery, and they did just that.

While not as facially meritless as their challenge to Count I, Defendants' contention that Plaintiffs lack a private right of action under Counts II and III (brought under Sections 47(b) and 36(a)) is inconsistent with the language of the ICA and, with respect to Section 47(b), was just last year rejected by Judge Samuel H. Mays, Jr. of the Western District of Tennessee. In plain terms, Section 47(b) allows "any party" to sue for rescission of contracts that violate other parts of the ICA. The Supreme Court has found a private right of action under nearly identical language of the Investment Advisers Act of 1940, the ICA's companion statute, and the SEC agrees that this precedent applies by analogy to Section 47(b). Congress also intended for private parties to sue under Section 36(a). The legislative history makes that perfectly clear.

Finally, Plaintiffs have satisfied any pre-suit demand requirement that may apply to Counts II and III. Such a requirement clearly does not apply to Section 36(b) or, by extension, to Plaintiffs' rescission claim predicated on Section 36(b). In addition, the complaint adequately alleges that demanding corrective action by the iShares boards would be futile. The Court has "reason to doubt" that the boards' approval of such grossly excessive lending fees was a valid exercise of business judgment. Requiring a pre-suit demand would also cause irreparable harm to iShares by delaying judicial relief from ongoing ICA violations. These violations jeopardize iShares's entire securities lending business.

3

# SUMMARY OF THE ALLEGATIONS

Defendants are a group of related entities that together orchestrate a "securities lending" business whereby shares owned by iShares ETFs are loaned to short sellers, persons seeking to profit from the decline in value of stocks.[2] Defendants have arranged the securities lending business so that they take at least 40% of all the revenue from lending iShares securities. ¶ 69. The market rate for securities lending services is far lower, from 0% to 10%. *See* ¶¶ 74, 83.

Funds generally use securities lending agents to manage securities lending transactions. ¶ 53. Such agents can be affiliated with the fund sponsor or advisor, or they may be independent third parties. ¶ 54. When the lending agent is affiliated with the fund sponsor, then the relationship is subject to heightened scrutiny, including scrutiny by the SEC, because it creates inherent conflicts of interest. *Id.* The fund sponsor can pass investor money out of the fund to an affiliated agent in the form of inflated fees and charges. ¶ 55. A 2011 academic study ("Adams Study") has confirmed that affiliated lending agents profit at the expense of investors: affiliated lending agents like BTC are associated with a 70% reduction in lending returns to fund investors. ¶ 56. The Adams Study, which "focus[ed] on index funds," the type of funds at issue in this case, found "strong evidence that the choice of security lending agent (e.g., affiliated vs. non-affiliated) is an important driver of variation across securities lending programs and suggest conflicts of interest result[ing] in lower securities lending returns for mutual fund shareholders." ¶ 58.

Defendants have chosen to employ an affiliated lending agent, Defendant BlackRock Trust Company, N.A. ("BTC"), to manage the iShares securities lending operations at issue in

---

[2] In securities lending, return is generated by "lending" out the mutual fund's securities, primarily to short-sellers—investors anticipating a decline in the price of the securities and seeking to profit from that decline—who post collateral in a value slightly in excess of the value of the borrowed securities to assure return of the securities at a later date. ¶¶ 44-46. The return on the collateral, plus any fees paid by the borrower, create income, increasing the value of the mutual fund. ¶ 44. The amount of fees the borrower pays, and whether the borrower pays a premium or receives a rebate, are all subject to individual negotiation, with little to no transparency as to pricing. ¶¶ 48-49, 52.

4

this case. BTC was hired at the direction of the iShares investment adviser, Defendant BlackRock Fund Advisors ("BFA"). ¶¶ 14, 15, 16, 35, 36. Typically, an investment adviser "selects the funds directors, manages the fund's investments, and provides other services." ¶ 35. BFA is a wholly-owned subsidiary of BFC, the securities lending agent it hired to manage the lending of securities owned by fund investors like Plaintiffs. ¶ 15. All of the Defendants, including BFA and BTC, are affiliates of Defendant BlackRock, the ultimate beneficiary of all securities lending charges imposed on iShares fund investors.

iShares' excessive fee structure exemplifies the harm to investors that often accompanies the use of affiliated lending agents. ¶¶ 79-85. Defendants together take at least 40% of all securities lending revenue earned by iShares mutual funds in the form of lending agent fees and other charges. ¶¶ 67-69. This is at least 300% higher than the industry market rate. ¶ 73. A 2012 industry study confirms that a majority of large plans have adopted a fee split of 90/10, rather than the 60/40, meaning that other investors receive 90% of the revenue generated on any securities lending transactions. ¶¶ 74-78. A leading iShares competitor, Vanguard, takes no share at all, returning 100% of net lending income to investors. ¶ 84. Competitors have reported that the actual cost of securities lending operations is less than 1% of revenue, leading one industry analyst to conclude that additional securities lending fees are "pure profit – in effect, money for nothing" for entities like Defendants. ¶ 83. These profits are central to the "business model of BlackRock." *See* ¶ 85. With respect to just the eight funds held by Plaintiffs, BTC earned more than $45 million in securities lending fees in 2012, tens of millions of dollars more than investors would have paid at the going market rate for services rendered. ¶ 140.

**ARGUMENT**

## I.     PLAINTIFFS STATE A CLAIM UNDER SECTION 36(b) OF THE ICA

With respect to Count I, based on breach of fiduciary duty under Section 36(b), Defendants urge this Court to abandon the SEC's long-held view that this provision applies to the very sort of securities lending transaction at issue here.  Were this Court to reject Plaintiffs' heretofore uncontroversial position that the cause of action for breach of fiduciary duty provided by Section 36(b) applies, it would necessarily be undoing years of contrary representations by the agency tasked with administering that provision—an agency position that reflects the only coherent reading of the statute.  Defendants' position, that the Court should dismiss Count I because the challenged compensation falls within a carve-out for "compensation or payments made in connection with transactions subject to section 17 of this title, or rules, regulations, or orders thereunder," *see* 15 U.S.C. § 80a-35(b)(4), is directly contrary to the position of the SEC. Defendants offer no legal authority for their position, since there is none, and they provide no analysis of the interplay between Sections 17 and 36(b).  Indeed, Defendants disingenuously omit any mention of the SEC's interpretation of those statutes in *Norwest*.  Defendants only argue that their conduct must be "subject to section 17" because the complaint alleges that they violated Section 17 and that they received an SEC exemption from Section 17.  Defs.' Br. at 7.[3] This facile argument fails for multiple reasons: (1) it misapprehends the significance of alternative pleading; (2) it ignores the SEC's longstanding interpretation, which is entitled to *Chevron* deference; (3) it is contrary to the plain language of the ICA; and (4) it absurdly suggests that Defendants will defend this case by arguing that they are "subject to section 17"— in other words, that they are operating in violation of the law.

---

[3] All "Defs.' Br. at __" references are to Defendants' Memorandum of Law in Support of Motion to Dismiss the Complaint (Doc. 22).  Certain Defendants filed a separate memorandum (Doc. 25) that simply adopted the arguments in the former.

6

As a threshold matter, Defendants' argument is strictly based on the pleading of the complaint, yet it ignores Plaintiffs' absolute right to plead in the alternative. It is elementary procedure that a plaintiff may plead alternative claims, "regardless of consistency." Fed. R. Civ. P. 8(d)(3). Count I, which sets forth the Section 36(b) claim, makes no mention of Section 17, and it does not depend on Section 17. By contrast, Count II alleges violations of Section 17(d) and (e) as predicates for the Section 47(b) claim for rescission. ¶ 175. Plaintiffs did not forfeit their Section 36(b) claim by alleging Section 17 violations elsewhere in the complaint. At this stage, "any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999); *cf. Bearden v. Honeywell Int'l, Inc.*, No. 3:09-1035, 2010 U.S. Dist. LEXIS 83996 at *18 (M.D. Tenn. Aug. 16, 2010) (Trauger, J.) (although much of complaint characterized product defect as a design defect, that did not preclude alternative warranty claim based on a workmanship defect). Since Defendants make no substantive legal argument, the Court does not need to go any further. In an abundance of caution, though, Plaintiffs will show that Section 36(b) applies under binding administrative authority, which is based on the only sensible reading of the statute.[4]

The SEC has categorically determined that the compensation of a securities lending agent is subject to the fiduciary standards of Section 36(b)—a position that has been incorporated into the Commission's published Releases and is entitled to heightened deference under *Chevron*. *See In re Norwest Bank Minnesota, N.A. and Society National Bank*, SEC No-Action Letter (pub. avail. May 25, 1995) (included in *Regulation of Investment Companies*, Section III, Appendix F (Matthew Bender & Co.) (attached as Exhibit A hereto). Defendants have conceded that the

---

[4] Plaintiffs anticipate that Defendants may seek leave to file a reply brief that addresses the law for the first time. The Court should not consider such arguments. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (as a matter of procedure and fairness to non-movant, issues raised for first time in a reply brief to district court are generally waived); *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682-83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time."). Defendants are properly limited to their pleading argument, which is clearly erroneous.

*Norwest* "no-action" letter specifically addresses the application of Sections 17 and 36 to the facts at issue here. Defendants confirm in their brief that they operate their securities lending program in reliance on an SEC published Release, in which their predecessors "represent[ed] that the duties to be performed by [the] lending agent will not exceed the parameters set forth in *Norwest Bank, N.A.* (pub. avail. May 25, 1995)." *See Maxim Series Fund, Inc.*, Notice of Application for Exemption, Investment Company Act Release No. 25,840, 67 Fed. Reg. 72706, 72707 (Dec. 6, 2002).[5]

The *Norwest* letter first addressed the question of whether Section 17(d) and (e) apply to securities lending through an affiliated agent, as here.[6] The letter concluded that Section 17(d) and its related regulation, Rule 17d-1 did not apply to the securities lending agent fees at all. *Id*. at 7. Some of the custodians' activities (selecting borrowers, executing loan agreements, and investing cash collateral) would implicate Section 17(e)(1). *Id*. However, because the fund advisors would supervise those activities, they "present[ed] little opportunity for the types of conflicts that section 17(e)(1) was designed to prevent" *Id*. Accordingly, the *Norwest* letter confirmed that the SEC would not apply Sections 17(d) or (e) of the ICA.

Significantly, in each part of its analysis, the *Norwest* letter emphasized that Section 36(b) would apply to the compensation of the investment advisor — in this case, BFA.

> Although rule 17d-1 does not apply to the Program, we note that **section 36(b) of the Investment Company Act expressly places a fiduciary duty on investment advisers with respect to any compensation paid to affiliated persons of the adviser.**

---

[5] After notice and an opportunity for hearing, the SEC granted the requested exemption. *Maxim Series Fund, Inc.*, Investment Company Act Release No. 25,878, 2002 SEC LEXIS 3327 (Dec. 27, 2002) (order).[5] One assumes that Defendants, after successfully obtaining this Release, will not contradict their representations to the SEC and attempt to distinguish themselves from *Norwest*. *See Edwards v. Aetna Life Ins. Co*., 690 F.2d 595, 598-99 & n.3 (6th Cir 1982) (discussing judicial estoppel in context of statements made to administrative agency).

[6] If the transactions at issue were subject to either Section 17(d) or (e), they would be banned outright. *See, e.g*., *United States v. Blitz*, 533 F.2d 1329, 1346 (2d Cir. 1976) (affirming conviction for accepting compensation in violation of Section 17(e)).

*Id*. at 10 n.14 (emphasis supplied).

> Our position [as to Section 17(e)] does not mean that there are no limits on how much a Fund may compensate its affiliated Custodian. . . . **[W]e note that the Custodian's compensation would be subject to section 36(b) of the Investment Company Act and, therefore, must fall within the range of what would have been negotiated by the parties at arm's length.**

*Id*. at 7 (emphasis supplied). The SEC's position that Section 36(b) applies to securities lending is thus clear and unqualified.

The *Norwest* no-action letter is the SEC's definitive interpretation of Sections 17 and 36(b) with respect to securities lending. The SEC has incorporated *Norwest* into numerous Releases authorizing securities lending by the nation's major mutual funds.[7] In a portion of its website describing "Securities Lending by U.S. Open-End and Closed-End Investment Companies," the SEC states:

> Notwithstanding these (and other) 1940 Act provisions, **funds engage in securities lending, in large part in reliance on the following staff no-action letters addressing the following areas: . . .** *Norwest Bank Minnesota NA; Society National Bank* **. . . Section 36 of the Investment**

---

[7] *See, e.g.*, Notice of Application for Exemption, Investment Company Act Release No. 26,073, 68 Fed. Reg. 36602 (June 18, 2003) (order granted at 2003 SEC LEXIS 3128 (July 9, 2003)); Notice of Application for Exemption, Investment Company Act Release No. 25,840, 67 Fed. Reg. 72706 (Dec. 6, 2002) (order granted at 2002 SEC LEXIS 3327 (Dec. 27, 2002)); Notice of Application for Exemption, Investment Company Act Release No. 25,424, 67 Fed. Reg. 9010 (Feb. 27, 2002) (order granted at 2002 SEC LEXIS 659 (Mar. 19, 2002)); Notice of Application for Exemption, Investment Company Act Release No. 25,218, 66 Fed. Reg. 54313 (Oct. 26, 2001) (order granted at 2001 SEC LEXIS 2593 (Nov. 16, 2001)); Notice of Application for Exemption, Investment Company Act Release No. 24,404, 65 Fed. Reg. 25521 (May 2, 2000) (order granted at 2000 SEC LEXIS 998 (May 18, 2000)); Notice of Application for Exemption, Investment Company Act Release No. 24,126, 64 Fed. Reg. 61952 (Nov. 15, 1999) (order granted at 1999 SEC LEXIS 2552 (Dec. 1, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 24,084, 64 Fed. Reg. 56823 (Oct. 21, 1999) (order granted at 1999 SEC LEXIS 2383 (Nov. 9, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 23,956, 64 Fed. Reg. 46735 (Aug. 26, 1999) (order granted at 1999 SEC LEXIS 1860 (Sept. 14, 1999)); Notice of Application for Exemption, Investment Company Act Release No. 22,693, 62 Fed. Reg. 30902 (June 5, 1997) (order granted at 1997 SEC LEXIS 1328 (June 24, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 22,679, 62 Fed. Reg. 29165 (May 29, 1997) (order granted at 1997 SEC LEXIS 1280 (June 17, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 22,541, 62 Fed. Reg. 11232 (Mar. 11, 1997) (order granted at 1997 SEC LEXIS 717 (April 1, 1997); Notice of Application for Exemption, Investment Company Act Release No. 22,181, 61 Fed. Reg. 46874 (Sept. 5, 1996) (order granted at 1997 SEC LEXIS 695 (Mar. 28, 1997)); Notice of Application for Exemption, Investment Company Act Release No. 21,878, 61 Fed. Reg. 16658 (Apr. 16, 1996) (order granted at 1996 SEC LEXIS 1343 (May 10, 1996)).

9

**Company Act and fiduciary duty of advisors** with respect to any compensation paid to affiliated persons of the adviser . . . .

http://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm (emphasis supplied) (last accessed March 28, 2013).

By incorporating *Norwest* into its releases, the SEC has made it the formal position of the agency, entitled to the highest degree of judicial deference. No-action letters themselves are persuasive authority. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 254 (2d Cir. 2006). However, an SEC Release "represents an interpretation of the Commission that is entitled to deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)." *SEC v. Blackwell*, 291 F. Supp. 2d 673, 694 (S.D. Ohio 2003) (parallel citations omitted); *see also SEC v. Cavanaugh*, 445 F.3d 105, 114 n.20 (2d Cir. 2006) ("We owe [*Chevron*] deference to the SEC's release."). Releases are accorded this high degree of deference because the Commission itself issues them after notice and opportunity for hearing and typically publishes them in the Federal Register.[8] If Congress has not directly spoken to the precise question at hand, *Chevron* requires that courts defer to the agency's interpretation, unless it is arbitrary, capricious or manifestly contrary to the statute. *Leyse v. Clear Channel Broadcasting, Inc.*, 697 F.3d 360, 372 (6th Cir. 2012).

*Norwest* is fully consistent with the text and purposes of the ICA. Giving the words their ordinary meaning, only transactions that must comply with Section 17 are "subject to section 17." A transaction that the SEC exempts from Section 17 certainly cannot be "subject to section 17."[9] Indeed, numerous authorities have specifically equated "exempt" with "not subject to."[10]

---

[8] For a discussion of the formal process used by the SEC to issue releases, see Donna M. Nagy, *Judicial Reliance on Regulatory Interpretation in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921, 932-33 (1998).

[9] Defendants seem to adopt such a tortured reading, claiming that their conduct was "subject to section 17" because the complaint alleges they received an SEC exemption from Section 17(d). *See* Defs.' Br. at 7.

10

This plain meaning is the only one that makes sense in the context of the ICA, as Congress granted the SEC extraordinarily broad power to exempt parties and transactions from any provision of the statute. *See* 15 U.S.C.S. § 80a-6(c). Congress enacted Section 36(b) because prior law failed to adequately control investment adviser compensation. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 537-39 (1984). Courts narrowly construe exclusions or exceptions to a remedial statute, *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 559 (6th Cir. 2006), and this rule of construction applies to the Section 36(b) carve-out. The Court should reject any construction that would undermine the very purpose of Section 36(b).

Section 17(d) does not govern investment adviser compensation, as *Norwest* properly found. It makes illegal joint activity between a registered investment company and an affiliate "in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant." 15 U.S.C. § 80a-17(d). Section 17(d) has no force of its own; it only comes into effect when the SEC prohibits a particular type of joint activity.

The SEC has explicitly *removed* investment adviser contracts from the ambit of Section 17(d). Section 15 of the ICA establishes the requirement of a written investment adviser contract that "precisely describes all compensation to be paid thereunder." *Id*. § 80a-15(a)(1). The SEC's Rule 17d-1 implements Section 17(d). It outlaws "any joint enterprise or other joint arrangement or profit-sharing plan," unless the SEC has granted an application approving it. 17 C.F.R. § 270.17d-1(a). However, "'[j]oint enterprise or other joint arrangement or profit-sharing plan' as

---

[10] *See Lakeview Meadows Ranch v. County of Santa Clara*, 32 Cal. Rptr. 2d 615, 617 (Cal. Ct. App. 1994) ("'Exempt' and 'not subject to' have essentially the same meaning . . . ."); *Michigan Millers Mut. Ins. Co. v. Farm Bureau General Ins. Co.*, 402 N.W.2d 96, 99 (Mich. Ct. App. 1986) ("An ordinary and plain meaning of 'exempt from' is 'not subject to.'"); *Hanson v. City of Omaha*, 46 N.W.2d 896, 899 (Neb. 1951) (by dictionary definition, "'exempt' means 'not subject to'"); Webster's Seventh New Collegiate Dictionary 291 (1970) (exempt adj . . . "2 : free or released from some liability to which others are subject").

used in this section . . . shall not include an investment advisory contract subject to section 15 of the Act." *Id.* § 270.17d-1(c). To avoid any doubt whatsoever, Defendants obtained a specific SEC exemption from Section 17(d). *See* ¶ 180; *Maxim*, Investment Company Act Release No. 25,878, 2002 SEC LEXIS 3327 (order).

Section 17(e) does not apply, either, to the investment adviser compensation at issue in this case. Section 17(e) forbids affiliates from accepting any compensation for acting as a purchasing or selling agent of a registered investment company. 15 U.S.C. § 80a-17(e)(1). A lending agent provides administrative services, such as recordkeeping and delivering securities, that "are not within the scope of section 17(e)(1)." *Norwest*, SEC No-Action Letter at 7. To the extent a lending agent purchases or sells property, *Norwest* assessed the danger of conflicts as low and opted against enforcement. *Id.* The SEC made a policy judgment concerning the scope of the ICA and advised the public that this activity was permissible. It exempted the entire "class . . . of transactions" pursuant to its statutory power. *See* 15 U.S.C. § 80a-6(c). It also gave rise to an agency position entitled to *Chevron* deference. However one looks at *Norwest*, it removed investment advisor compensation from the purview of Section 17(e) and placed it under Section 36(b).[11]

---

[11] The legislative history of Section 17 shows that compensation paid to an investment adviser and affiliates remains subject to Section 36(b), even when there are related Section 17 transactions. In the hearings on the 1970 amendments to the ICA, the chairman of the House committee considering the legislation stated:

> [A]ny amounts received, from whatever source by an investment adviser . . . [or] its affiliates . . . in transactions subject to section 17 . . . could . . . be taken into account by a court in determining whether the advisory fees meet the standards of section 36(b). Thus, for example, brokerage commissions received by a broker-dealer affiliated with an investment adviser . . . could be taken into account in determining whether the advised should have reduced its fees because of the benefits it received from the brokerage commissions. This would be the result despite the fact that such brokerage commissions would be permitted by Section 17(e). . . .

*Frankel v. Hyde*, No. 73-Civ-4665, 1974 U.S. Dist. LEXIS 9144 at *6 (S.D.N.Y. 1974) (quoting Rep. Budge, House Committee on Interstate and Foreign Commerce, 91st Cong., 1st Sess., pt. 1, at 178 (1969)).

Defendants will surely not concede that their securities lending practices violate Section 17, just to get the benefit of the Section 36(b) carve-out. If they did, they would face criminal fines and imprisonment, *see* 15 U.S.C. § 80a-48, to say nothing of civil suits like this. This business has operated for years on the SEC's assurance that it is not "subject to Section 17." Defendants cannot avoid the ICA completely, though. Investment advisor compensation has to satisfy Section 36(b).

A contrary interpretation would undermine the remedial purposes of the ICA. Section 17 regulates "most transactions between investment companies and their advisers," *Daily Income*, 464 U.S. at 536, subject to the SEC's broad power to exclude parties or transactions. If an SEC exclusion does not change whether something is "subject to section 17," then Section 36(b), enacted as a stronger limit on advisor fees, would apply to virtually nothing. No court has endorsed such a self-defeating construction of the ICA.[12]

## II. PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 47(b) OF THE ICA, ASSERTED IN COUNT II

Section 47(b) of the ICA creates a particularized cause of action for rescission of contracts that violate any other provision of the ICA, including but not limited to Sections 17 and 36. Here, Plaintiffs seek to rescind the contracts giving rise to Defendants' excessive and unlawful compensation on the ground that they violate Sections 17 and/or 36. Defendants concede that "Section 47(b) creates a private remedy" but deny that a private right of action exists to obtain this private remedy. Defs.' Br. at 9-10. This assertion contradicts the plain language of the statute, a closely analogous decision from the Supreme Court, the position of the

---

[12] Plaintiffs agree that they have not pled the direct receipt of securities lending compensation by Defendant Directors, which is required for liability under Section 36(b). *See* Defs.' Br. at 7-8. The Defendant Directors are still liable under Section 36(a) for breach of fiduciary duty. ¶ 220. If discovery reveals that Defendant Directors did receive part of the challenged compensation, Plaintiffs will amend their complaint to include a Section 36(b) claim against them.

SEC, and common logic. Section 47(b) gives Plaintiffs a private right of action for rescission of any contract that violates any provision of the ICA.

The only court within the Sixth Circuit to address this issue held "that § 47(b) of the ICA contemplates a private right of action." *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, 743 F. Supp. 2d 744, 762 (W.D. Tenn. 2010) (Mays, J.).[13] Other courts have held likewise. *Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir. 1977); *Esplin v. Hirschi*, 402 F.2d 94, 103-04 & n.21 (10th Cir. 1968); *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873, 880-81 (D. Md. 2005); *Wiener v. Eaton Vance Distribs. Inc.*, No. 10-10515-DPW, 2011 U.S. Dist. LEXIS 38375 at *41 (D. Mass. Mar. 30, 2011).[14]

The statutory text clearly allows a private plaintiff to sue for rescission. Section 47(b)(1) generally declares "unenforceable" a contract in "violation of this title":

> A contract that is made, or whose performance involves, a violation of this title, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this title or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this title.

---

[13] Defendants mischaracterize this holding as dicta. Section 47(b) was squarely at issue in *Regions Morgan Keegan*, as the plaintiffs asserted a claim under it. 743 F. Supp. 2d at 761. After finding that Section 47(b) creates a private right of action, the court went on to dismiss the claim for lack of standing because the plaintiffs were not parties to the contract and were not suing derivatively on behalf of a party. *Id.* at 762. The court would not have needed to reach the standing issue if the plaintiffs did not have a private right of action in the first place. Other courts have held that plaintiffs lacked standing to pursue a Section 47(b) claim for the same reason. *Lessler v. Little*, 857 F.2d 866, 874 (1st Cir. 1988); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 558 (E.D. Pa. 2005). Although these cases do not directly address the private right of action, as *Regions Morgan Keegan* does, they necessarily assume that one exists. Standing does not present a problem in this case because Plaintiffs are suing derivatively on behalf of iShares Trust and iShares, Inc., which were parties to the relevant contracts. *See* ¶¶ 171, 173.

[14] Defendants somehow claim this last decision as their own, despite the fact that it says, "Section 47(b) creates a private right of action for a party to a contract to void or rescind a contract . . . ." *See Wiener*, 2011 U.S. Dist. LEXIS 38375 at *41. The decision simply limits Section 47(b) to predicate violations of the ICA. *Id.*

15 U.S.C. § 80a-46(b)(1). Section 47(b)(2) goes on to vest private parties with a right of rescission:

> To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this title.

*Id*. § 80a-46(b)(2). To say that "a court may not deny rescission at the instance of any party" is equivalent to saying that a court must grant rescission to any party that requests it. Parties request judicial relief by filing a lawsuit. Thus, like many other federal statutes, Section 47(b) "borrows" substantive violations from elsewhere and creates a cause of action for them.[15]

The Supreme Court held that an almost identical provision of the Investment Advisers Act of 1940 ("IAA"), the ICA's companion statute, created a private cause of action. Section 215 of the IAA stated, "Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void . . . ." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 n.7 (1979) (quoting 15 U.S.C. § 80b-15(b)). The Supreme Court easily found a private right of action:

> In the case of § 215, we conclude that the statutory language itself fairly implies a right to specific and limited relief in a federal court. By declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that § 215 could be raised defensively in private litigation to preclude the enforcement of an investment advisers contract. But the legal consequences of voidness are typically not so limited. A person with the

---

[15] Other common examples include the Racketeer Influenced and Corrupt Organizations Act, which creates liability for predicate criminal offenses, *see* 18 U.S.C. § 1961(1); the Securities Exchange Act of 1934, which creates "control person" liability for another party's securities fraud, *see* 15 U.S.C. § 78t(a); and the Civil Rights Act of 1871, which creates liability for depriving someone of rights "secured by the Constitution and laws," *see* 42 U.S.C. § 1983.

> power to avoid a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid.
>
> \*       \*       \*
>
> For these reasons we conclude that when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract, and for restitution.

*Id*. at 18-19.

As compared to Section 215 of the IAA, Section 47(b) of the ICA provides even stronger support for a private right of action. The latter makes contracts "unenforceable," as opposed to "void." *See* 15 U.S.C. § 80a-46(b)(1). This language directly suggests litigation to have a contract deemed unenforceable. Moreover, Section 47(b) explicitly provides for the private remedy of rescission. *Id*. § 80a-46(b)(2). This makes it unnecessary to consider the "customary legal incidents" of unenforceability. *See Transamerica*, 444 U.S. at 19.

The SEC concurs that a private right of action exists under Section 47(b). At the invitation of the Second Circuit Court of Appeals, the SEC filed an amicus curiae brief stating that a violation of the ICA—in that case, Section 26(f) or 27(i)—"would clearly give rise to a cause of action under Section 47(b)." Brief of SEC as Amicus Curiae at 8-9, *Olmsted v. Pruco Life Ins. Co*., 283 F.3d 429 (2d Cir. 2002) (attached as Exhibit B hereto).[16] Citing *Transamerica*, the SEC stated, "The Supreme Court precedent makes clear beyond reasonable dispute that private plaintiffs may seek rescission of a contract provision charging excessive fees." *Id*. at 8. "Indeed, given the explicit language in Section 47(b)(2) that creates a presumption in favor of rescission, the remedy under the current version of Section 47(b) should be viewed as an express rather than an implied one." *Id*. Courts give considerable weight to an agency's construction of

---

[16] Available at http://www.sec.gov/litigation/briefs/olmsted.htm (last accessed March 28, 2013). Plaintiffs have given pinpoint citations to the copy of the amicus curiae brief printed from the SEC's website.

a statutory scheme it is entrusted to administer, even without notice-and-comment rulemaking. *United States v. Mead Corp.*, 533 U.S. 218, 227-28, 230-31 (2001).[17]

Defendants failed to bring *Transamerica* or the SEC's view, the most relevant authorities at hand, to the Court's attention. Their cases either ignore or misunderstand these authorities. *See Steinberg v. Janus Capital Mgmt., LLC*, 457 Fed. Appx. 261, 267-68 (4th Cir. 2011) (denying the existence of a private right of action with no citation or analysis whatsoever); *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 677 F.3d 178, 187 (3d Cir. 2012) (attempting to distinguish *Transamerica* on the basis that "unenforceable" does not imply a suit for rescission like "void" does), *cert. denied*, 133 S. Ct. 529 (2012).

Defendants rely on *Alexander v. Sandoval*, 532 U.S. 275 (2001), and its general principles for identifying a private right of action. *Sandoval* does not call into question *Transamerica* or the SEC's interpretation of Section 47(b). Indeed, *Sandoval* cites *Transamerica* with approval for its focus on Congressional intent. *Id.* at 286-87. The SEC filed its amicus curiae brief on December 5, 2001, months after the *Sandoval* decision.

A *Sandoval* analysis, which Defendants do not bother to perform, only confirms that a private right of action exists under Section 47(b). To create a private right of action, a statute must have "rights-creating" language that focuses on the individuals protected, not those regulated. *Id.* at 288-89 (citing *Cannon v. University of Chicago*, 441 U.S. 677, 690 n.13 (1979)). *Sandoval* held up Section 601 of Title VI as an example of rights-creating language: "no person . . . shall . . . be subjected to discrimination." *Id.* at 288; *see also Cannon*, 441 U.S. at 681, 689-90 (finding private right of action under parallel language of Title IX). Section 47(b) of the ICA requires a court to grant rescission "at the instance of any party." 15 U.S.C. § 80a-

---

[17] The Second Circuit Court of Appeals declined to rule on this issue because the plaintiffs had not made a claim under Section 47(b). *Olmsted*, 283 F.3d at 436 n.5.

46(b)(1)-(2). This language, too, has an "unmistakable focus on the benefited class." *Cf. Cannon*, 441 U.S. at 691.

The broader structure of the ICA does not undermine the existence of a private right of action under Section 47(b). Some of Defendants' cases find it significant that Congress made an explicit cause of action in Section 36(b) and gave the SEC enforcement power over the rest of the statute. *Santomenno*, 677 F.3d at 186; *Smith v. Oppenheimer Funds Distrib.*, 824 F. Supp. 2d 511, 518 (S.D.N.Y. 2011). These cases employ faulty logic.

The IAA also gave the SEC general enforcement power, but that did not trouble the Supreme Court as it found a private right of action for rescission under Section 215. *See Transamerica*, 444 U.S. at 14. The SEC disclaims that it has exclusive power to enforce Section 47(b) of the ICA. *See* Brief of SEC as Amicus Curiae at 8-9.

Furthermore, the detailed right of action in Section 36(b) does not raise a negative implication for Section 47(b). The express provision of one method of enforcing "a substantive rule" suggests that Congress intended to preclude others. *Sandoval*, 532 U.S. at 290; *see Transamerica*, 444 U.S. at 19-20 (express criminal, civil, and administrative remedies for Section 206 of the IAA implied absence of private right of action under Section 206). Here, Defendants are comparing two different ICA sections. Congress intended Section 47(b) to have a much larger scope and function than Section 36(b). Section 36(b) only gives a private right of action to "a security holder of such registered investment company" and only for certain breaches of fiduciary duty. 15 U.S.C. § 80a-35(b). In contrast, Section 47(b) gives "any party," including "either party" to a contract, the right to sue for rescission if the contract violates any part of "this title." *Id*. § 80a-46(b)(1)-(2). Section 47(b) encompasses parties and substantive violations well beyond Section 36(b). *See Russello v. United States*, 464 U.S. 16, 23 (1983)

(where Congress includes particular language in one section of a statute but omits it in another section, courts generally presume that Congress acted purposely).

Finally, Defendants' attempt to minimize Section 47(b) as a mere "remedy" makes no sense. Plaintiffs agree that a contract must otherwise violate the ICA to be subject to Section 47(b).[18] However, so long as Plaintiffs show an underlying violation, they have a private right to sue for rescission. Defendants would artificially limit the predicate violations to one part of the ICA, Section 36(b), because it independently provides a right of action. Defs.' Br. at 10. This argument founders on the statutory text. Section 47(b) is addressed broadly to violations of "this title." *See* 15 U.S.C. § 80a-46(b)(1). It provides relief for a wide variety of ICA violations.

## III. PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION UNDER SECTION 36(a) OF THE ICA, ASSERTED IN COUNT III

Courts have found an implied private right of action under Section 36(a), 15 U.S.C. § 80a-35(a). *Tannenbaum v. Zeller*, 552 F.2d 402, 417 (2d Cir. 1977); *McLachlan v. Simon*, 31 F. Supp. 2d 731, 737 (N.D. Cal. 1998); *Young v. Nationwide Ins. Co.*, 2 F. Supp. 2d 914, 925-26 (S.D. Tex. 1998); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 796 (S.D.N.Y. 1997), *overruled on other grounds*, 282 F.3d 162, 171 (2d Cir. 2002); *In re Nuveen Fund Litig.*, No. 94 C 360, 1996 U.S. Dist. LEXIS 8071 at **11-17 (N.D. Ill. June 11, 1996); *Seidel v. Lee*, No. 93-494-JJF, 1994 U.S. Dist. LEXIS 21534 at *8 (D. Del. Oct. 14, 1994); *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 542 (D. Del. 1994).

---

[18] Many of the cases cited by Defendants stand for nothing more than this unremarkable fact. *Smith v. Franklin/Templeton Distribs., Inc.*, No. C 09-4775, 2010 U.S. Dist. LEXIS 56516 at *20 (N.D. Cal. June 8, 2010) ("The court finds no language in ICA § 47(b) sufficient to create a private right of action under that statute, absent a showing of some other violation of the ICA."); *Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, No. A-06-CA-540-LY, 2006 U.S. Dist. LEXIS at **30-32 (W.D. Tex. Nov. 17, 2006) (without deciding the issue, stating that it "appears to be the case" that "§ 47(b) is only available upon a showing of other violations of the ICA"), *adopted*, No. A-06-CA-540-LY, 2007 U.S. Dist. LEXIS 98853 (W.D. Tex. Jan. 23, 2007); *Hamilton*, 396 F. Supp. 2d at 558-59 ("A plaintiff asserting a claim under the Investment Company Act may seek relief under Section 47 only after a violation of some other section of the Act has been established.").

19

When Congress amended the ICA in 1970 and again in 1980, it stressed that it intended to preserve such a cause of action. *See* S. Rep. No. 91-184, 91st Cong., 1st Sess. 16 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4931 (explaining that the provision of a private right of action in Section 36(b) "should not be read by implication to affect" the practice of implying a private right of action under 36(a)); H.R. Rep. No. 96-1341, 96th Cong., 2d Sess. 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4811 ("The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff fails within the class of persons protected by the statutory provision in question. . . . In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under section 36(a) of the Investment Company Act." (footnotes omitted)).

Plaintiffs acknowledge that, since *Sandoval*, the trend has been to deny a private right of action under Section 36(a). However, they submit that the cases finding a private right of action better uphold Congressional intent. Legal context matters to the extent it clarifies the statutory text. *Sandoval*, 532 U.S. at 288. As the legislative history shows, Congress enthusiastically approved of a private right of action.

## IV. TO THE EXTENT A PRE-SUIT DEMAND REQUIREMENT APPLIES TO COUNTS II AND III, PLAINTIFFS HAVE ESTABLISHED DEMAND FUTILITY

Plaintiffs bring Count II (Section 47(b)) and Count III (Sections 36(a)) derivatively on behalf of iShares Trust and iShares, Inc. ¶¶ 171, 219. At least one aspect of the Section 47(b) claim does not have a pre-suit demand requirement at all. Where required, Plaintiffs have adequately pled that demand would be futile under applicable state law.

### A. No Demand Requirement Applies to Plaintiffs' Section 47(b) Claim, to the Extent it is Based on a Section 36(b) Violation

Plaintiffs have predicated their Section 47(b) rescission claim on violations of Sections 17(d), 17(e), 36(a), and 36(b). ¶ 175. Insofar as this claim rests on a Section 36(b) violation,

Plaintiffs have no legal obligation to make a demand or to show why demand should be excused. The Supreme Court has held "that Rule 23.1 does not apply to an action brought by a shareholder under § 36(b) of the Investment Company Act and that the plaintiff in such a case need not first make a demand upon the fund's directors before bringing suit." *Daily Income*, 464 U.S. at 542. If no demand requirement attaches to Section 36(b), then one does not materialize simply because Plaintiffs are using Section 47(b) to address the violation.

**B.     The Complaint Adequately Demonstrates Demand Futility**

       **1.     Governing Legal Standards**

In a derivative action under the ICA, Rule 23.1 does not create a demand requirement but deals with the adequacy of the complaint. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96 (1991). Rule 23.1 requires particularized factual statements that are essential to the claim, but it does not require the plaintiff to plead evidence. *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001). The court must apply the substantive law on demand futility from the state of incorporation of the registered investment company. *Kamen*, 500 U.S. at 108-09. Therefore, Delaware law applies to iShares Trust, *see* ¶ 11, and Maryland law applies to iShares, Inc., *see* ¶ 10.

       **2.     Demand on the Board of iShares Trust is Futile Under Delaware Law Because There is Reason to Doubt That the Board Exercised Valid Business Judgment**

Under the *Aronson* test, demand is excused where the plaintiff alleges facts creating a reasonable doubt that "(1) 'the directors are disinterested and independent' or (2) 'the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1980), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244, 253 & n.13 (Del. 2000). "[I]f either prong is satisfied, demand is excused." *Brehm*, 746 A.3d at 256.

Here, the complaint meets the second prong of *Aronson*. This prong focuses "on the substantive nature of the challenged transaction and the board's approval thereof." *Pogostin v.*

*Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds*, *Brehm*, 746 A.2d at 253 & n.13. To rebut the presumption of business judgment, the allegations must "raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003). The court should consider "the accumulation of all factors" creating reasonable doubt. *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990).

The Board of Trustees approved the excessive compensation arrangement with BTC. ¶¶ 70, 107. This resulted in at least 40% of the lending revenues going to BTC, BFA, and other BlackRock affiliates. ¶ 156. Comparable large funds pay a 10% lending fee, if any at all. *See* ¶¶ 74, 83. The Board of Trustees either failed to conduct due diligence on the true value of BTC's securities lending services or simply ignored such evidence. ¶ 161.

In general, the use of an affiliated lending agent raises serious concerns. The Adams Study compared the use of affiliated and non-affiliated lending agents, focusing on index funds like the ones in this case. ¶ 55. It found that affiliated lending agents are, on average, associated with a 70% reduction in lending returns. ¶ 56. The author viewed this as "compelling evidence" of conflicts of interest, suggesting self-dealing behavior by affiliated lending agents. ¶¶ 57-58. iShares's experience is consistent with the Adams Study. The rate of return on securities loaned by iShares (between 0.25% and 0.30% in 2011) is substantially lower than for funds administering their own lending programs (0.93%) or using unaffiliated lending agents (0.49%). ¶¶ 60-61. Why would iShares happen to choose an affiliated entity as its lending agent?

iShares paid dearly for affiliated lending services. BTC alone received more than $45 million last year in fees associated with just the eight iShares ETFs held by Plaintiffs. ¶¶ 13,

140.[19]  The securities lending fees charged to iShares are at least 300% more than the industry norm.  ¶ 73.  A majority of plans provide lending agents a 10% securities lending fee.  ¶ 78.  Only 12% of them provide lending fees in excess of 20%.  *Id.*  Some major firms, like Vanguard, take none of the net revenue and have costs of "well under 1%."  ¶¶ 81, 83.  *Wall Street Journal* columnist Jason Zweig stated, "That suggests that most of the 30%-to-50% toll charged by other fund managers is pure profit – in effect, money for nothing."  ¶ 83.  Why would not iShares use a different lending agent that passed on all the net revenue?

The lure of "money for nothing" has driven up the volume of securities lending on behalf of iShares.  The Adams Study found an association between affiliated lending agents and increased levels of lending.  ¶ 55.  The percentage of iShares assets on loan is more than seven times the industry average for self-lending funds, four times higher than for funds using unaffiliated agents, and more than double the industry average for funds using affiliated lending agents.  ¶ 130.  Why would iShares engage so heavily in securities lending, which carries substantial risk, when it is paying more and reaping less?

The Court has excellent reason to doubt that this grossly excessive compensation resulted from an informed, good faith business judgment by the Board of Trustees.  Defendants misapply the corporate waste standard.  For cases asserting waste claims under Delaware common law, courts have refined the second prong of *Aronson* and will excuse demand if they have "reasonable doubt" whether the board committed waste—something that is always devoid of valid business judgment.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009).  Waste is fact-specific, and courts may excuse demand based on reasonable

---

[19] Much larger are the total fees received by all BlackRock affiliates for the entire family of iShares ETFs, though Plaintiffs do not have access to those exact figures.  iShares comprises at least 440 separate ETFs, which had assets totaling more than $480 billion as of May 2011.  ¶¶ 12, 155.  On average, iShares ETFs lend 20% of the securities they own.  ¶ 126.  BFA and BlackRock generate daily returns and fees on an average of $120 billion in cash collateral from the iShares securities lending program.  ¶ 147.

23

doubt, even if they cannot make a concrete determination. *See id.* (excusing demand where court had "very little information" on true value of CEO's exit package); *see also Weiss v. Swanson*, 948 A.2d 433, 450 (Del. Ch. 2008) (refusing to dismiss waste claim because court could not rule out "reasonably conceivable set of facts" supporting claim).

Plaintiffs here do not have to establish a common law waste claim, but their allegations certainly create the reasonable doubt needed for demand futility. The fact that iShares gets 60% of the lending revenue is irrelevant. It is, after all, money earned by lending iShares's property. The question is whether iShares gets anything proportionate in exchange for the 40% diverted to BFA, BTC, and other affiliates. Since the actual costs of securities lending are less than 1%, *see* ¶ 83, paying this "money for nothing" is the very definition of waste. *See Brehm*, 746 A.2d at 263 (waste is "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration").

### 3. Demand on the Board of iShares, Inc. is Futile Under Maryland Law

Under Maryland law, a shareholder can establish demand futility by clearly alleging that "a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation." *Werbowsky v. Collom*, 766 A.2d 123, 144 (Md. 2000). Maryland courts have not clarified what constitutes irreparable harm in the demand futility context.

Making a demand on the Board of Directors of iShares, Inc., would cause irreparable harm. Once a shareholder makes a demand, it must wait to bring a derivative action until the board completes its investigation. *Regions Morgan Keegan Sec. v. Sullivan*, No. 10-2188, 2011 U.S. Dist. LEXIS 102967 at **28-30 (M.D. Tenn. Sept. 9, 2011). Maryland law does not set a specific time limit for such an investigation, but it can certainly take months. *See id.* (dismissing plaintiffs who only waited four months after making demand to sue). This delay would harm the corporation in two major ways.

First, the excessive compensation being paid puts iShares's entire securities lending operation in jeopardy. Defendants recognize that "neither BTC nor any of its affiliates would be permitted to act as Lending Agent for the ETFs absent an order from the SEC." Defs.' Br. at 5. To obtain permission from the SEC, Defendants represented that their securities lending compensation would be "fair and reasonable in light of the usual and customary charges imposed by others." ¶ 180. The securities lending compensation is neither reasonable nor customary, and every day that it continues, iShares faces the risk that the SEC will revoke its permission. That would abruptly shut down securities lending and a major source of revenue to iShares and its investors. The SEC could also initiate an enforcement action involving iShares. Plaintiffs have to take immediate action to protect the corporation and cannot wait months for a board investigation.

Second, if Plaintiffs made a demand based on their Section 36(a) and 47(b) claims, they would have to decide how to proceed on their Section 36(b) claim, which does not have a demand requirement. *See Daily Income*, 464 U.S. at 542. Plaintiffs could wait to sue on all claims at once, after the board investigation, but the delay would eliminate a significant part of the Section 36(b) damages. *See* 15 U.S.C. § 80a-35(b)(3) ("No award of damages shall be recoverable for any period prior to one year before the action was instituted."); *cf. Jones v. Hoel*, 211 F. Supp. 2d 823, 828-29 (E.D. Tex. 2002) (refusing to dismiss case on abstention grounds because statute of limitations would have run, causing plaintiffs irreparable harm). Otherwise, Plaintiffs could sue under Section 36(b) immediately and wait to file a separate suit under Section 36(a) and 47(b), but that would subject the corporation to needless, parallel litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.

Dated: March 28, 2013

Respectfully submitted,

**/s/ James G. Stranch, III**

James G. Stranch, III, BPR #002542
J. Gerard Stranch IV, BPR # 023045
Michael G. Stewart, BPR # 016920
Michael J. Wall, BPR #024774
BRANSTETTER, STRANCH
  &amp; JENNINGS, PLLC
227 Second Avenue North
Nashville, TN 37201
Tel: (615) 254-8801
jstranch@branstetterlaw.com
gstranch@branstetterlaw.com
mstewart@branstetterlaw.com
mwall@branstetterlaw.com


**ROBBINS ARROYO LLP**
Brian J. Robbins (admitted *pro hac vice*)
Craig W. Smith (admitted *pro hac vice*)
Jenny L. Dixon (admitted *pro hac vice*)
600 B. Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
jdixon@robbinsarroyo.com


**THE PICKRELL LAW GROUP, P.C.**
C. Mark Pickrell, BPR # 015605
William G. Brown, BPR # 029072
Andrew E. Hill, BPR # 031156
5701 Old Harding Pike
Suite 200
Nashville, TN 37205
Tel: (615) 352-9588
mark.pickrell@pickrell-law.net
will.brown@pickrell-law.net
drew.hill@pickrell-law.net

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true and accurate copy of the foregoing document was served via the Court's ECF system on this 28th day of March, 2013, upon:

C. Mark Pickrell
William G. Brown
Andrew E. Hill
5701 Old Harding Pike, Suite 200
Nashville, TN 37205
mark.pickrell@pickrell-law.net
will.brown@pickrell-law.net
drew.hill@pickrell-law.net

Jeremy Berman
Seth M. Schwartz
Skadden, Arps, Slate,
Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522
jeremy.berman@skadden.com
seth.schwartz@skadden.com

John M. Tipps
John C. Hayworth
Emily B. Warth
Walker, Tipps & Malone
2300 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219-2415
mtipps@walkertipps.com
jhayworth@walkertipps.com
ewarth@walkertipps.com

Bruce H. Schneider
Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038-4982
bschneider@stroock.com

                                       */s/ James G. Stranch, III*